[S. F. No. 16989.   In Bank.   May 7, 1946.]

VIRGINIA J. HANSEN, Respondent, v. BEAR FILM COM-
PANY, INC. (a Corporation) et al., Appellants.

Brobeck, Phleger & Harrison for Appellants.

Richard S. Goldman, Gorman R. Silen and A. B. Bianchi for Respondent.

CARTER, J.—Defendants appeal from a judgment which, among other things, decrees that plaintiff, as sole heir of her deceased father, is the equitable owner of all of the stock of defendant Bear Film Company, and which directs defendants, as trustees, to forthwith deliver the stock certificates to her and transfer legal title thereto in fulfillment of the trusts under which it is held.

The main question presented is that of the sufficiency of the evidence to support the trial court's findings that a valid trust exists and that plaintiff's claim is not barred by laches or the statute of limitation.

For convenience reference will be made to members of the Hansen family by their first names. Josephine T. Hansen, plaintiff's paternal grandmother, migrated from Copenhagen to the eastern United States, where she made a home for her sons, Charles, Oscar, and Albert. Oscar married a Michigan girl, Fay, and on October 18, 1916, their daughter Virginia (plaintiff) was born.

In 1919 or prior thereto, Oscar came to San Francisco and obtained work with Wakelee's Drug Store. He established a home for his wife and child, and also for Josephine who after a short time came west and joined the family. In 1920 Fay returned to Michigan, Virginia was sent back later and raised there. Oscar secured a decree of divorce on the ground of desertion, and from 1920 until his death in 1929 he saw Virginia only twice, on the occasion of business trips east. But he carried on a desultory correspondence with her, expressed great affection for her, contributed $25 a month to her support, and he was planning at the time he died to bring her to California. After the separation from his wife, Oscar made his home with Josephine, toward whom he manifested great love, affection, and respect.

The brother Albert became a professor at Purdue University and attained some fame as a writer of articles touching the subject of his professional work. The brother Charles, with his wife and children, moved to California. Being incapacitated by a lifelong illness, he received constant financial help from Oscar and Josephine, and had their assurances of continued assistance.

Soon after his employment in the drug store Oscar conceived the idea of establishing an independent photo finishing business. He formed a partnership with Warren S. Quinn, the manager of the drug store, and in 1919 opened a small establishment in a basement on O'Farrell Street. Funds or equipment advanced by Quinn apparently furnished the little capital available. Oscar was given the full management of the concern. Whether Josephine made initial or later financial contributions to the business is a subject of uncertainty. Several witnesses testified to conversations wherein Oscar had commented on the fact that his mother had put up money for his business and that he wished her to profit by his success. It was also said that she may have been able to furnish several thousand dollars from money received from property in Copenhagen, from her earnings in running a rooming house in the east, and from her management of the apartment house in which she and Oscar lived in San Francisco. At any rate, the business was a success from its inception, and when it was incorporated in 1921 as Bear Film Company, with a capital stock of 5,000 shares, held in equal amounts by Oscar and Quinn, its assets were valued in an application to the Corporation Commissioner at approximately $9,775.

Quinn took no active part in the business. Oscar was elected president of the corporation and held that position as long as he lived. At all times he had active charge and management of the concern. In 1924 the partners agreed upon a reorganization. The articles of incorporation were amended to change the corporate stock from 5,000 shares of a single class to 2,500 shares of preferred stock, representing 70 per cent of the corporate assets, and 2,500 shares of common stock, representing the remaining 30 per cent of the assets. The old stock was surrendered. The new preferred stock was issued 2,499 shares to Oscar and one share to his nominee, and the new common stock was issued to nominees of Quinn. The effect of this reorganization was to increase Oscar's interest in the corporate assets from 50 to 70 per cent, and to decrease Quinn's interest correspondingly.

About November 2, 1926, Oscar executed an instrument in writing wherein he recited his ownership of the preferred stock and his intent "to divest himself of title to the said stock and vest such title absolutely in Josephine T. Hansen," and further stated: "Now, Therefore, for value received O. C. Hansen hereby transfers and assigns all his right, title and interest in the said . . . [2500] shares of the preferred stock of the Bear Film Co. . . . to Josephine T. Hansen." The trial court found that on or about the day of execution of this instrument Oscar delivered it to Josephine and at the same time surrendered his stock certificates, properly endorsed, and caused to be issued a new certificate for 2,499 shares of preferred stock in Josephine's name, and a certificate for one share in his own name. Oscar secured legal advice as to the means of validly effectuating the transfer, and, in addition to the steps mentioned above, he caused appropriate entries to be made in the stock certificate book, the stock journal, and the stock ledger of the corporation.

On November 3d, the day following the transfer, Josephine rented a Bank of America safe deposit box, which she retained until January, 1928. Whether she deposited in this box the instrument executed by Oscar and her certificate for 2,499 shares of stock is a subject on which there is no direct evidence, but the trial court found that delivery of these documents was made by Oscar to Josephine on November 2d.

A few days after the transfer, and on November 8, 1926, upon the resignation of Oscar's attorney from the board of directors of the corporation, Josephine was elected a director

in his place, and she was also appointed vice-president in place of Quinn. At a director's meeting on November 16th, Oscar's salary, which had theretofore been $500 a month, was increased to $1,250 a month, retroactive from January 1, 1926, and he was also voted a $10,000 bonus "in consideration for services rendered in the past." The books of the corporation were made to reflect a credit of the $10,000 bonus to Oscar, and he returned that sum as income on his 1926 federal income tax statement, but he did not actually draw out the money.

On November 24, 1926, a dividend of $4.20 a share on the preferred stock and $1.80 a share on the common stock was declared, payable January 10, 1927. This was the first dividend declared by the company after 1922, when a dividend of 50 cents a share was paid. The check covering the $10,-495.80 dividend on 2,499 shares of preferred stock was drawn in favor of Josephine and deposited in her bank account. Although the genuineness of her endorsement of the check is questioned, and it is claimed that her name was written by Oscar, the trial court found that the check was endorsed by her. The check covering the $4.20 dividend on the remaining share of preferred stock was made out to Oscar, endorsed over by him to Josephine, and deposited in her bank account. The $4,500 dividend on the common stock went to Quinn.

On February 5, 1927, Oscar and Quinn entered into an agreement whereby Quinn agreed to sell his 2,500 shares of common stock to Oscar for $30,000, $10,000 of which was to be paid in cash and the balance of $20,000 in monthly installments of $750 each, with interest on overdue installments at the rate of 7 per cent. To secure payment of the $20,000 balance, Oscar agreed to give Quinn his promissory note guaranteed by the corporation, and as collateral to assign to Quinn certain life insurance policies aggregating $13,000, and to procure and assign to Quinn an additional policy for $2,000. Josephine was the beneficiary of the pledged policies. One of the provisions of the $20,000 promissory note of Oscar was that "the entire unpaid balance of the principal sum shall immediately become due and payable in the event that the undersigned shall voluntarily dispose of the controlling interest of Bear Film Co., a corporation. . . ." On the same day that the agreement was executed (February 5, 1927), there was a meeting of the directors of the corporation, at which Josephine and all of the other directors were present, and a resolution was unanimously adopted to the effect that con-

temporaneously with the execution by Oscar to Quinn of his promissory note, the corporation would execute a guarantee of the note.

In performance of the agreement, the $10,000 down payment to Quinn was made by a personal check of Josephine, the source of which was the $10,495.20 dividend paid her on January 10th. The first monthly installment of $750 was paid by Josephine, the money being derived from a $750 salary check delivered to Oscar by the corporation, and by him endorsed and delivered to Josephine, who endorsed and deposited it in her account. All subsequent payments up to the time of Oscar's death were made by the corporation to Quinn and charged by the corporation against Oscar's salary on its books. At the time of Oscar's death a balance was still owing to Quinn. This balance was paid by checks of the corporation, as follows: April 20, 1929, $750; May, 1929, $750; and June, 1929, the balance with accumulated interest, $1,413.10. Each of these payments made after Oscar's death was likewise charged against his account on the corporate books.

On February 18, 1927, Quinn delivered over the certificates of common stock, endorsed in blank, and under Oscar's direction 2,490 shares were immediately reissued in the name of Josephine and 10 shares in the name of the secretary of the corporation. The trial court found, although the finding is challenged, that the certificate for 2,490 shares was forthwith delivered to Josephine and that she continued to retain possession of it until after the death of Oscar. The secretary's certificate was endorsed by her in blank and given to Oscar. Both Josephine and the secretary receipted for their certificates on the stub of the corporation's certificate book.

The completion of this transaction left three stockholders of record, Josephine with 2,499 shares of preferred and 2,490 shares of common stock, the secretary with 10 shares of common stock, and Oscar with one share of preferred stock. On February 21, 1927, Oscar and the secretary executed and filed with the Secretary of State and county clerk a formal certificate of diminution, reducing the number of directors of the corporation from four to three. This document recited that Josephine was the owner and holder of 2,499 shares of preferred and 2,490 shares of common stock of the corporation, and that Oscar was the owner and holder of one share of preferred stock, and it quoted a writing signed by Oscar and

Josephine consenting to the reduction. The reduction was also supported by appropriate entries in the corporate minutes.

Between the time of the transfers of the preferred and common stock to Josephine and Oscar's death, he was in full charge of the corporation and asserted complete control over its affairs. The trial court found that subsequent to the transfer of the common stock, Oscar "carried on, operated and managed the business of said corporation as his own personal business and in total disregard of the fact that the apparent ownership of all the corporate stock was in Josephine T. Hansen and as if the legal title to all said corporate stock was in his own name." With the exception of questioned entries late in 1928 and thereafter, the minute book of the corporation shows no record of meetings. It contains only two resolutions authorizing the borrowing of money, with no supporting minutes, and 25 uniform slips reciting that in the absence of a quorum the regular monthly meeting adjourned. At the end of 1927 a bonus of $10,000 was credited to Oscar on the corporate books and at the end of 1928 a similar credit was given him, both without formal corporate action.

The trial court found that during this time there was not a total disregard by Oscar of the corporate entity "but there was a disregard of the corporate entity in this: that during all said time the board of directors of said corporation was under his complete dominance, control and direction and all of the members of said board relinquished entirely to him their discretion and judgment in all corporate matters, and were not called upon to give, and did not give, any suggestions or advice respecting the control or management or direction of said corporation, nor did they assert their right to do so. In the keeping of the corporate minute books and bookkeeping books and accounts and otherwise in the management and handling of said business, an effort was made by Oscar C. Hansen and the employees acting under his control and orders, to carry out corporate forms and to give the appearance of the operations of a corporation. Whenever Oscar C. Hansen needed funds for any use or enterprise of his own he would draw them from the funds of said corporation by merely directing the employees to draw checks for such funds for such purpose as he directed, and to charge the funds so drawn as he directed, and his said orders and directions were never questioned or disobeyed. In this respect said Oscar C. Hansen commingled the funds of said corporation with his personal

funds and commingled his personal funds with those of said corporation, and to that extent only. That this was with the knowledge and consent of Josephine T. Hansen.''

In other words, as the trial court further found, Oscar's management of the business after the transfers to Josephine was exactly as it had theretofore been. In income tax returns Oscar listed some of the stock under his ownership. However, the returns, both before and after the transfer to Josephine, were apparently prepared by accountant Rosendorn, and were inaccurate in several of their declarations. In applications for insurance and in remarks to insurance agents Oscar referred to himself as the proprietor or owner of the Bear Company. On a number of occasions in the course of social and business conversations he referred to the company as his own. But on many other occasions he made affirmations of his mother's ownership of the stock and business. For the most part these remarks seem to have been casual conversational generalities.

On April 26, 1929, on his way to work, Oscar died suddenly. He was but 39 years of age and his passing prostrated Josephine and caused consternation at his office. Myrtle Hansen, wife of the invalid brother Charles, came immediately to offer comfort to Josephine. Search was made for a will of Oscar but none was found. Oscar's private papers and all corporate records, exclusive of books of account and the corporate minute book, were found in his office safe. Josephine requested Mr. Levin, an attorney who had been performing legal services for the company, to take over its management until the brother Albert could arrive from Purdue University, Indiana. A resolution was adopted appointing Mr. Levin counsel and assistant secretary of the corporation at a salary of $200 a month.

On Monday, April 29th, the third day after Oscar's death, Josephine and Myrtle called at the office at Mr. Levin's request. There, according to the testimony of Myrtle, Mr. Levin handed Josephine some papers of a greenish hue which he referred to as shares of stock of the company which must be put in a safe place. He then drove the ladies to a bank, where Josephine rented a safe deposit box. Although it is urged that this event may have marked an attempted first delivery to Josephine of the corporate stock, that theory is weakened by uncertainties in Myrtle's testimony, by a bank record indicating that Josephine's first entry into the deposit box occurred at a later date, and by Mr. Levin's denial of any such

occurrence. According to Mr. Levin it was not until the question whether the Oakland business was a branch of the corporation was under discussion that Josephine exhibited to him her stock certificates. He had never before seen them.

The trial court found, as aforesaid, that the delivery of the stock occurred in Oscar's lifetime, and in this connection commented: "With respect to delivery—there was a good deal of time put in on it and a great deal of handwriting testimony, and so forth—I am satisfied that there is not sufficient evidence on the plaintiff's side against the delivery of the certificates to make a finding to the effect that the certificates were not delivered. They were produced from that side of the house. They were not found in neutral territory. And in addition to that, there were writings made which would be consistent with delivery and would be inconsistent with the fact that the delivery had been incomplete."

Albert arrived from Indiana on the evening of April 30th. After a considerable period of indecision he yielded reluctantly to Josephine's insistence that he give up his professional career and take over the management of the company. Charles, who had long been aided financially by Josephine and Oscar, and to whom Oscar had promised continued aid and a place in the business, vigorously asserted a right to protection and a share of the earnings of the company, and protested the gaining of any advantage by Albert. The friction between Charles and Albert was a source of great disturbance to Josephine. Some consideration was given to possible sale of the concern. It then had an estimated value of $70,000 to $100,000 or more. Despite the drain of the Quinn purchase, it was solvent, and as more than $35,000 life insurance had been taken out by Oscar for the benefit of the corporation, working capital was available from that fund. Whether Albert fully disclosed to Josephine and Charles the then market value of the concern, and whether his discovery of its worth finally swayed his decision to remain in California is not conclusively shown.

The daughter Virginia was promptly notified of her father's death by telegram and letters. She was then about thirteen years of age. Through her mother's correspondence with members of the family, with Mr. Levin, and others in California she was given to understand that the business belonged entirely to Josephine and that Oscar left only a small and "heavily involved" personal estate. But she was assured that

everything would be done to realize as large a sum as possible from it for her as the sole heir of Oscar. She and her mother were not suspicious and rested in the family assurances that their interests were being cared for.

Albert demanded financial protection in return for the sacrifice of his career and his promise to remain in California. After much negotiation, and in June, 1929, he and Josephine executed an instrument whereby, in consideration of his promise to manage the business, Josephine agreed "to sign over" to him all of the corporate stock in her name, provided: 1. That she be placed on the payroll of the corporation for life at a salary of $300 a month; 2. That Albert should have no interest in any other property held by her; and 3. That either before or after her death Albert should contribute $10,000 to establish a trust fund for the benefit of Charles.

Josephine had already transferred some of her stock to Albert prior to the date of the agreement. Albert made two trips east to effect a final severance of his connection with the University, and after his return in September, 1929, the remainder of the stock was transferred to him. Charles was discontented with the provision made in his behalf, and in December, 1929, he was placed on the company payroll at $100 a month. This too failed to satisfy his demands and he continued to foment the family discord. He induced Josephine to consult an attorney and open further negotiations with Albert. As a result a new agreement was executed in March, 1930, by Josephine, Albert, and Charles. It confirmed the transfer of the stock to Albert, contained elaborate provisions for the benefit of Josephine, Charles, and Charles' children, reserved in Albert the right to terminate his obligations at any time by retransferring the stock to Josephine, and contained this further significant provision:

"If any final judgment hereafter shall be rendered against second party [Albert] finding that first party hereto [Josephine] was not the owner of said shares of Bear Film Company at the time of the transfer thereof by her to second party hereto and accordingly decreeing that second party hereto is not the owner thereof, then and in such event all obligations of second party herein contained to make payments or cause payments to be made shall cease and terminate."

On June 4, 1929, about the time of execution of the first agreement between Albert and Josephine, Josephine wrote Charles stating, among other things: "I am writing this to ask

you not to write to Virginia, or at least look out that you are not unintentionally doing me harm, that would mean that you would be doing harm to yourself too, because you and Albert get it after me. If her mother should take another lawyer we are sunk. This morning a letter came here from Virginia to Albert, in it she says, that she heard Oscar say that he was the sole owner of the Bear Film Co., and if so (she says) it belongs to me, he kept Grandma all his life and she will be getting the furniture where she lives. Now carl what do you think of that? Her mother would just love to throw me in the gutter and leave me there, but fortunately Oscar did not intend for her to do so. I called up Albert and read part of the letter for him, so he can see the lawyer about it before he answers that. . . .''

During the transition period after the death of Oscar, Attorney Levin advised Josephine and Albert to some extent, and also received permission from Virginia's mother to look after her interest. At his suggestion Josephine and Mr. Uhle, manager of the Oakland branch of the company, were appointed to administer Oscar's estate. Virginia's mother was appointed by a Michigan court as her guardian to receive distribution. There was some correspondence between her attorney in Michigan and Mr. Levin.

In order to settle the question whether the Oakland business was a personal venture of Oscar, or was a branch of the corporation, an action was filed by the company against Josephine and Uhle as administrators of Oscar's estate. Judgment was permitted to go for plaintiff by default, thus settling the status of the Oakland business as part of the corporation, and not as part of Oscar's estate. At this time Josephine wrote Charles: ''Tomorrow at 2 o'clock comes up the case in court whether the Oakland plant belongs to us or Virginia. I do hope the judge will decide in our favor. It would be terrible if it goes to Virginia.''

Another business started by Oscar in Oakland, the Paru Rubber Company dealing in contraceptives, was conceded to be a personal venture and not a part of the film corporation, but it was not a success and its losses were charged against Oscar. Credits in a considerable sum standing to Oscar's account on the books of the corporation were largely offset by debit entries made after his death. Insurance which he had taken out for the benefit of Virginia had been allowed to lapse. He had some money on deposit in the bank, but little other personal estate. Upon distribution Virginia received about

$3,400 and a parcel of unimproved land in Oakland, from the sale of which she ultimately realized a very small additional sum.

Josephine discouraged correspondence with Virginia. In December, 1931, when there was a suggestion that Virginia might take a trip to California, she wrote saying: "Dear Virginia: Buy yourself a little something for Christmas. I am sorry to disappoint you about your suggested trip to California but I cannot possibly defray the expense. Hoping you are well and may pass a happy holiday. Love Grandmother."

Josephine died on December 7, 1932. No will was found and no probate of her estate was had. Albert meanwhile had continued to operate the business. From the time of the family agreement he was the record owner, in his name and through nominees, of all of the stock of the corporation except that in 1939 he transferred 500 shares of the preferred and 500 shares of the common stock in trust for his son Robert. The corporation prospered under his management, but on March 25, 1940, at the age of 48, he too passed away. By his will the remainder of the stock, over that transferred in trust for his son Robert, passed in trust for his wife, son, and daughter.

After Albert's death Charles again sought legal advice. He disclosed facts which caused his attorney to write to Virginia, then 23 years old. Almost immediately Virginia came to San Francisco, and on August 16, 1940, the original complaint herein was filed. The cause went to trial in February, 1941, on an amended complaint containing six counts. Count one sought a money judgment for the amounts due Oscar from the corporation. Counts two and three alleged that the preferred and common stock respectively were transferred to Josephine by Oscar upon an express oral trust to transfer it back to Oscar at his request or to Virginia upon Oscar's death. Counts four and five alleged that the preferred and common stock respectively were never delivered by Oscar to Josephine. Count six alleged a resulting trust for Oscar in the common stock.

In March, 1941, Charles, who was then 53 years of age, died without having been called upon to testify. Mr. Rosendorn, the accountant who had made out Oscar's tax returns, supervised the keeping of the corporate books, and advised Oscar in financial matters, was 70 years of age and in ill health. His testimony had to be taken by deposition. Other witnesses, old company employees, friends of Oscar and Jo-

sephine, and the surviving members of the families of Charles and Albert, were either lacking in clear recollection of the occurrences long past or without knowledge of them. Therefore, although the trial was a prolonged one and volumes of evidence were received, the trial judge was without the aid of any direct testimony from which he could determine the issues tendered by the pleadings, and was compelled to base his findings in favor of plaintiff upon his resolution of conflicting inferences.

The court found, as already stated, that the preferred and common stock were delivered by Oscar to Josephine, but it also found that the transfer by Oscar to Josephine of the legal title to all the preferred stock was made upon ''her express oral promise and agreement that she held and would continue to so hold the whole thereof . . . in trust for the said Oscar C. Hansen, to be delivered and transferred back to. the said Oscar C. Hansen at his request;'' that she did not promise or agree that she held the stock in trust for the heirs of Oscar, or for his daughter (plaintiff) upon his death; that Oscar never demanded a retransfer from Josehpine during his lifetime, although at all times he had the right, as the ''real, true and equitable owner of all said stock'' to require its immediate retransfer into his name, and upon his death it was the duty of Josephine to immediately transfer all of the stock into his name or into the name of his administrators, as representatives of his estate.

With respect to the common stock, the court made a like finding of an express oral trust. It also found that none of the funds placed in the Quinn-Hansen partnership were furnished by Josephine, and none of the funds used to purchase the common stock were provided by her; that the funds used for the latter purchase were furnished by Oscar, who was the sole and beneficial owner of both the funds and the stock, and that Josephine held only the bare legal title to the stock as trustee for Oscar.

Elaborate findings were made to the effect that the transfer of the preferred stock to Josephine's name, the declaration of the dividends and the voting of the $10,000 bonus in 1926 were all a part of a single plan conceived and carried out by Oscar to enable him to acquire the common stock from Quinn and thereby to own for himself all of the stock, preferred and common, of the corporation.

Findings were also made in favor of plaintiff on her claim

for money items, and on the issues of laches and the statute of limitation. The judgment ran against the widow of Albert, individually and as executrix of his will, and against his children and the Bear Film Company, all of whom are appellants herein.

From the above resumé it will be seen that the facts, and the inferences which may reasonably be drawn from them, afford sufficient support for the trial court's conclusion that Oscar transferred to Josephine only the bare legal title to the preferred and common stock and that he intended to and did at all times retain in himself the full equitable ownership. It is true that various motives for the transfer were suggested, such as a plan to effect tax savings, to secure protection in the Quinn purchase, or to guard against possible claims of creditors growing out of individual enterprises, but no *motive* was established, and the trial court expressly made no finding with respect to motive. But the *intent* to transfer legal title, and such title only, to Josephine was sufficiently established, and the trial court's findings on the subject must be accepted as conclusive.

The following comment, taken from a memorandum opinion of the trial court, shows in part the inferences which were reasonably drawn under his analysis of the evidence: ''The Bear Film Company business just before November, 1926, had a net worth, easily, of $100,000, *and Oscar Hansen had made it all*, with Warren Quinn's financial help, and the great loyalty and cooperation of a number of 'old-timers' who had been with him, some of them from the very start, most of them from the early days. But nobody will say that Oscar Hansen was not the Bear Film Company or that the Bear Film Company was not Oscar Hansen. He dominated it from the very beginning, Warren Quinn taking but small interest in its management. After Mr. Quinn had committed himself to the sale, Oscar Hansen had nobody to consult but himself, and could see nothing ahead of him but continued growth, expansion and success, with eventual monopoly of the film-developing business in this city and its tributary territory. *A $100,000 business all his own.* Oscar Hansen, the testimony shows, was a man of unusual initiative and great determination. He was a man who could not imagine himself as dependent upon anybody, or a mere employee of anybody. He had accomplished these things almost alone.

In a way it might be said he was a genius. In this particular business he was the outstanding leader. He had earned this position of leadership; he had worked night and day to reach it; and he was conscious of it every waking hour of the day. . . .

''The testimony is not very satisfactory as to just what Josephine T. Hansen was worth in 1926. She had the apartment on Geary Street and despite her age and Oscar's success she rented rooms. This would indicate a more or less dependent position. What is beyond dispute, however, is the fact that Oscar had taken out $20,000 or more life insurance in her favor, so she would be well provided for when he died. Meanwhile there never was any question that Oscar would take good care of her while he lived. . . .

''Oscar *was* rich, and we will assume that his mother was, by comparison with him, poor. *But Oscar was rich only as long as he owned the stock.* Once that was gone he would have nothing but a job—a job in this prosperous company, which he had fathered, but, after all, only a job. He had, perhaps, a few dollars, and the Oakland lot which finally sold for about $1,500. *But he would no longer own his company; that would be gone.* Thereafter he would be subject to his mother's orders, for she would own what had been *his* stock. This needs no further elaboration. Oscar Hansen was not the man to do this thing. With all his devotion to his mother, he was not the person to turn over to her as a cold gift practically everything he had in this world. With what the evidence shows of his temperament, disposition and traits,—particularly his tremendous ambition, and his determination to eliminate competition in his line, all these things, coupled with the fact that he had made it all 'the hard way,' and after a very tough struggle, it simply cannot be concluded just when the acquisition of the Quinn stock was assured [that he decided] to immediately give away the whole thing, 'lock, stock and barrel', to his mother, who was already apparently living comfortably and with a sufficiency considering her modest needs. *If ever there was an improvident gift this would be it.*

''One further suggestion: An outright gift to Josephine would have made it possible for her to divide the stock up, *inter vivos,* between herself and Albert and the other son. Such combination of interests might not have been as friendly to Oscar as if she alone held it; but it was a possibility and

Oscar was too shrewd not to be mindful of it. And further: Such gift would have divested him of the wherewithal to properly take care of his daughter, the plaintiff, to whom he owed a legal as well as a moral duty of support, and who was, of course, the real and natural object of his bounty upon his death. Under the law plaintiff was his sole heir. . . .

"Under this test it cannot possibly be held that a gift was intended. It would have stripped him of practically every dollar in the world, won by the hardest kind of work and struggle; it would have divested him of the power— in his field—which meant so much to him, and which went only with the possession of money. It would have finished him, in his late thirties, so far as future accomplishment was concerned. It would have made rich an elderly woman who needed neither money nor power, and at the same time would have impoverished a man in his prime, who needed the money —his *own*—and wanted to retain the power that went with it. . . .

"From February 18, 1927, until his death in April of 1929 Oscar Hansen continued to run the business just as he had before the transfer of the stock to his mother. . . . There was no change. The appearance of Josephine at the plant occasionally meant nothing. She certainly had nothing to do with the real running of the business or the formation of the policy thereof at any time prior to Oscar's death. She was not in any way qualified to do so, particularly while he lived. She was an elderly woman, not trained in business, essentially a housewife, and certainly with no knowledge, experience or training in this highly specialized business,—a business rather unique and in a class by itself, and one where speed in turning out the work and in getting the pictures back to the customers was of the essence. There is an abundance of evidence in the record that Oscar continued not only to manage the business as before but to dominate it in every way as he always had, all with his mother's complete acquiescence. The grantee, mother, gave no appearance, to the employees, to the customers, to the competitors, or to the world generally, that she had anything to do with it. . . .

"In this connection the declarations of Oscar on the income tax returns that he owned the stock, and the declarations, both oral and written, to the insurance company that

he was the sole owner of the Bear Film Company, are to be considered. Oscar Hansen continued on as president of the company to the time of his death. On January 18, 1929, the company borrowed $10,000 from Bank of America . . . and a promissory note was given, signed by the Company by O. C. Hansen, President, and by Neita Drake, Secretary. On March 29, 1929, an additional note for $8,000 was given to the same bank, similarly executed and signed. . . . Both notes were endorsed and guaranteed by O. C. Hansen. This was two years after the stock had been put into Josephine's name. He thereby committed himself to respond for $18,000 if the Company did not pay. *With what would he have responded? It certainly was an implied or tacit representation to the bank that he owned the stock.*

"When O. C. Hansen died the Quinn stock had not been fully paid for. . . . Payments . . . were made by Bear Film Company, and each of them was charged post mortem to Oscar C. Hansen's account on the books of the company, just as the $750 monthly payments had been charged during his lifetime. It must be admitted that this was *consistent;* that it carried out the plan of the Quinn agreement. *But it was consistent with Oscar's beneficial ownership of the stock and not with Josephine's.* Oscar had died. These payments remained due. If Josephine owned the stock why did she not pay them?

"Finally, Josephine Hansen received no dividend, salary or other income by reason of her holding of the stock up to Oscar's death. What has just been said respecting Oscar's management and domination of the business is sufficient to cover Josephine's negative acts and conduct with respect to the running of the business. . . ."

It is thus apparent that the evidence gives rise to the inference that the transfers made by Oscar to Josephine were transfers of legal title only, and that Oscar at all times intended to and did retain the full beneficial ownership. ▮ Nor can it be successfully contended that there is no evidence which shows with reasonable certainty the terms and conditions of the trust (see *Estate of Gaines,* 15 Cal.2d 255 [100 P.2d 1055]; *Chard* v. *O'Connell,* 7 Cal.2d 663, 666 [62 P. 2d 369]; *Lefrooth* v. *Prentice,* 202 Cal. 215, 227 [259 P. 947]; *Sheehan* v. *Sullivan,* 126 Cal. 189 [58 P. 543]), and that therefore the trust must fail. The evidence is suscep-

tible of the inference that the terms of the express trust were precisely as found by the trial court, to wit: That Josephine was to hold the bare legal title in trust for Oscar, to be delivered and transferred back to Oscar at his request. ▉ Since Oscar did not demand a retransfer during his lifetime, it was the duty of Josephine, upon his death, to immediately convey title to all of the stock into his name or that of the representatives of his estate. In other words, upon the death of Oscar, the express trust failed, and Josephine then held the trust estate upon a resulting trust for the estate of Oscar. (Rest., Trusts, § 411, p. 1258, § 419, subd. 2, p. 1295; 2 Bogert, Trusts and Trustees, § 468, pp. 1443-1444; 3 Scott on Trusts, § 419, p. 2193; 54 Am.Jur. pp. 155-156; 65 C.J. § 151, p. 376; *Bainbridge* v. *Stoner,* 16 Cal.2d 423, 428 [106 P.2d 423]; *Wittfield* v. *Forster,* 124 Cal. 418 [57 P. 219]; *Estate of Ralston,* 1 Cal.2d 724 [37 P.2d 76]; *Estate of Hamon,* 136 Cal. App. 517 [29 P.2d 326].)

▉ Although it is necessary, in order to establish a trust, to offer clear and convincing proof, such proof may be indirect, consisting of acts, conduct, and circumstances (*Airola* v. *Gorham,* 56 Cal.App.2d 42, 49 [133 P.2d 78]; *Kobida* v. *Hinkelmann,* 53 Cal.App.2d 186 [127 P.2d 657]; *Cooper* v. *Cooper,* 3 Cal.App.2d 154 [39 P.2d 820]), and the question whether the showing is clear and convincing is primarily one for the trial court (*Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 7 [147 P.2d 583]; *Stromerson* v. *Averill,* 22 Cal.2d 808, 815 [141 P.2d 732]).

▉ Appellants contend that the trial court erred in admitting in evidence oral and written declarations of ownership of the stock and of the company made by Oscar, not within the presence or to the proved knowledge of Josephine, but subsequent to the transfers to her and in derogation of them. (*Chard* v. *O'Connell* (1936), 7 Cal.2d 663, 667 [62 P.2d 369]; *Francoeur* v. *Beatty* (1915), 170 Cal. 740, 747 [151 P. 123]; *Bollinger* v. *Bollinger* (1908), 154 Cal. 695, 705 [99 P. 196]; *Miller* v. *Miller* (1942), 55 Cal.App.2d 199, 207-208 [130 P.2d 438]; *Taylor* v. *Bunnell* (1926), 77 Cal.App. 525, 534 [247 P. 240].) However, under well recognized exceptions to the hearsay rule, such declarations, made before, at the time of, or subsequent to the transfers, were properly admissible on the issue of delivery to Josephine (and it was found that the instruments were delivered to her), on the issue of a claimed

gift, and also to show the intent or state of mind of Oscar. (*Whitlow* v. *Durst* (1942), 20 Cal.2d 523, 524 [127 P.2d 530]; *Jean* v. *Jean* (1929), 207 Cal. 115 [277 P. 313]; *Bridge* v. *Ruggles* (1927), 202 Cal. 326, 330 [260 P. 553]; *Estate of Carson* (1920), 184 Cal. 437, 445 [194 P. 5, 17 A.L.R. 239]; *Williams* v. *Kidd* (1915), 170 Cal. 631, 648 [151 P. 1, Ann.Cas. 1916E 703]; *Stout* v. *McNab* (1910), 157 Cal. 356 [107 P. 1005]; *Fanning* v. *Green* (1909), 156 Cal. 279, 285 [104 P. 308]; *Estate of Hall* (1908), 154 Cal. 527, 532 [98 P. 269]; *Sprague* v. *Walton* (1904), 145 Cal.228, 234 [78 P. 645]; *Dinneen* v. *Younger* (1943), 57 Cal.App.2d 200, 207 [134 P.2d 323]; *O'Dea* v. *Hibernia Savings & Loan Soc.* (1932), 119 Cal.App. 622 [7 P.2d 318]; 19 Cal.L.Rev. 231, 249-254; 26 Cal.L.Rev. 631; Annotations, 105 A.L.R. 398.)

The rule is succinctly stated in *Whitlow* v. *Durst, supra,* 20 Cal.2d at pp. 524-525: "When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving. Thus, in cases involving the delivery of deeds, declarations of the alleged grantor made before and after the making of the deed are admissible upon the issue of delivery, and it is immaterial that such declarations are in the interest of the party producing them. (*Williams* v. *Kidd,* 170 Cal. 632 [151 P. 1, Ann.Cas. 1916E 703]; *Donahue* v. *Sweeney,* 171 Cal. 388 [153 P. 708]; *De Cou* v. *Howell,* 190 Cal. 741 [214 P. 444]; See McBaine, *Admissibility in California of Declarations of Physical or Mental Condition,* 19 Cal.L.Rev. 231, 251.) Likewise, in gift cases declarations made by the grantor before, contemporaneously, and subsequent to the alleged gift are admissible though the statements be self-serving. (*Sprague* v. *Walton,* 145 Cal. 228 [78 P. 645].)"

Appellants claim that the parol evidence rule precluded the trial court from admitting oral proof to show that the purportedly absolute transfers were in fact transfers of legal title only, subject to an oral trust to reconvey upon demand. In support of this position they cite the Restatement, Trusts, section 38, page 122, and 1 Scott on Trusts, section 38, page 226, where the text in part reads: ". . . Conversely, extrinsic evidence is not admissible to show that the grantor intended that the grantee should hold the property upon trust,

if the instrument of transfer clearly states that he is to hold the property for his own benefit, free of trust.'' Here the written instrument purported only to divest the transferor of title and vest it in the transferee. It contained no recital that the transferee was to hold the property for her own benefit, nor did it mention a trust or beneficial interest. Under the circumstances, the applicable rule is that found in the Restatement, *supra,* section 38, subdivision 3: ''If the owner of property transfers it inter vivos to another person by a written instrument in which it is not declared that the transferee is to take the property for his own benefit or that he is to hold it in trust, extrinsic evidence may be admitted to show that he was intended to hold the property in trust either for the transferor or for a third party.'' (See, also, *Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 20-21 [147 P.2d 583]; *Estate of Gaines,* 15 Cal.2d 255, 265 [100 P.2d 1055]; *In re Kellogg,* 41 Cal. App.2d 833, 840 [107 P.2d 964].)

With reference to the common stock, the trial court found, in addition to an express oral trust, a purchase money resulting trust. In the evidence showing that the consideration for the common stock was paid by Oscar, with conveyance made through him to Josephine, there is ample support for the finding (*Goes* v. *Perry,* 18 Cal.2d 373, 379 [115 P.2d 441]; *Kirk White & Co.* v. *Bieg-Hoffine Co.,* 6 Cal.App.2d 188, 191 [44 P.2d 439]; 25 Cal.Jur. 178-191.)

By amendment to their answer after trial of the cause, appellants set up as an affirmative defense that Oscar's intent and purpose in making the transfer to Josephine was to defraud his creditors and to evade the payment of federal income taxes. Appellants contend that such a motive or purpose is illegal and therefore the trust cannot be enforced by Oscar or his heir; furthermore, that the trial court's failure to find on this material issue requires a reversal of the judgment.

Appellants confuse Oscar's ''intent and purpose'' in making the transfers to Josephine, with his ''motive.'' Under the findings the ''intent and purpose'' of Oscar was to transfer legal title to Josephine and to retain equitable ownership in himself. The ''motive'' which may have prompted this action is obscure and, so far as this appeal is concerned, is immaterial. The trial court did at one point express the view that Oscar may have been considering a tax advantage, but it made no finding to that effect, and instead expressly refrained from making any finding of ''motive.'' It did find, however, that

at the time of the transfers Oscar had no outstanding money obligations of any considerable or substantial amount, or in excess of small, current, personal bills, other than the obligation to Quinn. Regardless of what Oscar's undisclosed motive may have been, there is in the record no evidence whatsoever of any fraud practiced upon his creditors. If there was a plan to escape future liability, it never materialized, so far as the record shows; and if the transaction resulted in evasions under the federal taxing statutes, that is an exclusive concern of the federal authorities. (See *Jones* v. *Re-Mine Oil Co.*, 47 Cal.App.2d 832, 841 [119 P.2d 219]; *Nishi* v. *Downing*, 21 Cal.App.2d 1, 4 [67 P.2d 1057]; *Wollenberg* v. *Tonningsen*, 8 Cal.App.2d 722, 728-729 [48 P.2d 738, 742].)

█ It is urged that Albert was a purchaser for value of the corporate stock from Josephine without knowledge of any trust, and that therefore no trust may be enforced against him or his successors in interest. The court found that Albert did not in good faith believe that the stock belonged to Josephine as her own property; that as president, director, and manager of the corporation he had access to and controlled the corporate books and became possessed of sufficient knowledge and information to put him, as a prudent man, on inquiry as to the true ownership of the stock; that among other facts he learned that the purchase price of the common stock was paid for by the money and earnings of Oscar, that the installments had all been, and were still being, charged against Oscar even after his death; and that at all times after the transfers to Josephine, Oscar had continued, as theretofore, to control and manage the corporation and that Josephine had taken no part whatever in such control and management. These findings, showing that Albert took with notice of the equities of Oscar's estate, have sufficient support in the evidence. And since Albert took with notice of the equities, it is immaterial whether the transfers to him are considered as having been made with or without a legal and adequate consideration. (25 Cal.Jur. 222-225.)

Appellants pleaded as defenses the statute of limitation and laches, and the trial court found against them on both issues. Many of the facts bearing upon these issues have already been set forth. The trial court found that as early as May, 1929, Albert wrote plaintiff that Oscar owned no stock in the corporation at the time of his death and that all of the stock belonged to Josephine; that like information.

was furnished in 1929 and 1930 by the attorney for the corporation and for the administrators of Oscar's estate (Josephine and Mr. Uhle); that shortly after the death of Oscar, Josephine prevailed upon Albert and Charles to write nothing to plaintiff, or her mother, which would give them any information of what was being done in connection with the corporation, or any knowledge of the circumstances under which the stock transfers were made; that from and after the death of Oscar, and while Josephine was administratrix and thereafter, she carried on a course of conduct designed to suppress and conceal and which did suppress and conceal from plaintiff and her mother the truth with respect to the stock and ownership thereof and with respect to the true assets of Oscar's estate.

The court further found that plaintiff, who was thirteen years old at the time of Oscar's death, believed that her father owned the Bear company, and believed it to be strange and peculiar that she did not receive whatever would represent or show her interest in that business, but that she had the utmost confidence in her grandmother Josephine, and her uncle Albert, and their attorney, and in the other persons in control of the business, all of whom had been close friends of her father, and, having such confidence, she was not suspicious that her rights had been violated, but had a definite conviction that said persons would not do anything to cause her rights to be violated. The court also found that as early as 1933 plaintiff received an anonymous letter telling her that her father had been the owner of the company and that she had been defrauded of property which rightfully belonged to her, and suggesting that she start an investigation, but that nevertheless plaintiff made no effort whatever to investigate her rights and when she came of age she still refrained from making any investigation; that Albert was the only person still alive at the time plaintiff reached her majority who was fully able to explain certain facts and answer charges concerning the transactions which eventuated in this litigation; that plaintiff came to San Francisco in July, 1940 (after the death of Albert and just prior to the time this action was commenced), to investigate and enforce her alleged rights in the premises; that at that time she had no more information than that contained in the anonymous letter of 1933, and

a letter of June 27, 1940, written to her by the attorney consulted by Charles.

From these facts so found the court concluded that the action was not barred by the statute of limitation. In weighing the sufficiency of the evidence to support this conclusion, it is to be noted that Josephine was the administratrix of Oscar's estate, and that she occupied at the same time the inconsistent position of claimant to ownership of all of the stock of the company by gift from Oscar; also that the letter written by her to Charles on June 4, 1929, and hereinbefore quoted, shows conclusively her attempt to have the facts concealed from plaintiff. From this and other letters and the evidence as a whole the trial court could infer that Josephine deliberately set out to hide the true situation from plaintiff and her mother, notwithstanding she occupied a fiduciary position as administratrix of the estate of Oscar, and was also trusted by plaintiff because of their relationship. In other words, there is in the evidence sufficient support for the conclusion of the trial court that because of the misrepresentations and concealment practiced by Josephine, Albert, and those acting under Josephine's direction, the statute of limitation did not commence to run until plaintiff's actual discovery of the real situation in 1940. Where a defendant is guilty of fraudulent concealment of the cause of action, the statute of limitation is deemed not to become operative until the aggrieved party discovers the existence of the cause of action. (*Pashley* v. *Pacific Elec. Ry. Co.*, 25 Cal. 2d 226, 229 [153 P.2d 325]; *Kimball* v. *Pacific Gas & Elec. Co.*, 220 Cal. 203 [30 P.2d 39]; *Laraway* v. *First Nat. Bk. of La Verne*, 39 Cal.App.2d 718 [104 P.2d 95].)

There is no merit in the contention that because Josephine's coadministrator Uhle could have brought action on behalf of Oscar's estate, the statute of limitation commenced to run against the estate and therefore continued to run against plaintiff after distribution of the estate to her (16 Cal.Jur. § 152, p. 557). Mr. Uhle testified that he made no independent investigation to determine what property belonged to Oscar's estate, but got his information entirely from Josephine, Albert, the attorney, and the company auditor. If the concealment of the facts from plaintiff, her guardian, and their attorney operated to toll the statute until actual discovery, then the concealment of the facts from

coadministrator Uhle had the same effect during the administration of Oscar's estate.

The question of laches was also one for the trial court's determination. (*Austin* v. *Hallmark Oil Co.*, 21 Cal. 2d 718, 734-735 [134 P.2d 777].) The same evidence which supports the finding that the statute of limitation was tolled until discovery of the misrepresentation also necessarily supports the finding that plaintiff was not guilty of laches, particularly as this action was commenced within three years of the time plaintiff attained her majority and almost immediately after her discovery.

The court found that Albert and his estate received from the Bear Film Company for services rendered to it by him from 1929 until his death, the sum of $81,210.09, but that the reasonable value of his services to the corporation for that period was not less than that amount and the amount of dividends paid out to him and his estate, and that the corporation was not entitled to recover or attempt to collect from its codefendants any part of said sums paid Albert or his estate on account of dividends.

In addition the court decreed that plaintiff was entitled to recover from the corporation certain money items. The corporation has filed separate briefs on appeal challenging this award, as well as the findings and judgment as a whole.

The first item awarded plaintiff is $61,000, with interest in the sum of $17,676.09, representing dividends actually paid on the corporate stock subsequent to April 26, 1929. It is conceded that if the trial court's adjudication of ownership of the stock is upheld, this award must also be upheld.

The other items, five in number, comprise an award of $18,950, together with fourteen years' interest, $18,688.91, or a total of $37,638.91. $10,000 of this sum represents a bonus credited to Oscar on the books of the corporation at the end of 1928. $5,000 the court found was loaned to the corporation by Oscar for the use of its Oakland branch. $2,250 represents an alleged balance of unpaid salary at $750 per month for February, March, and April, 1929. $1,500 represents a charge made on the books of the corporation after Oscar's death with a corresponding credit to Josephine. The other $200 represents a sum paid to the attorney by the corporation after Oscar's death and charged against his account.

That portion of the award representing the last

two items listed is unquestionably correct. The corporation, as a matter of law, was not entitled to pay alleged debts of Oscar after his death, and take credits for those payments in accounting to Oscar's estate. If Josephine claimed that Oscar owed her $1,500 at the time of his death her proper recourse as an administratrix was to present a creditor's claim against his estate for that amount. The claim would in that event have come under the scrutiny of the probate judge for approval or rejection, as the proof warranted (Prob. Code, § 703). Similarly, if Oscar owed the attorney $200, the proper procedure was for the attorney to present a creditor's claim for that amount against the estate (Prob. Code, §§ 710, 711). When the corporation elected to pay these claims and deduct the sums so paid from the amount due Oscar's estate, it acted without legal authority. Since no demand was made against the estate by Josephine or the attorney, claims against the estate are now barred (Prob. Code, §§ 707, 716; 11A Cal.Jur. § 521, p. 734). And since the corporation by its own conduct prevented the allowance and payment of the claims in the manner contemplated by the law, it may not claim credit for the sums which it disbursed. It acted as a volunteer and cannot recover for its voluntary payment, made without request for or promise of reimbursement, of the debts of Oscar. (*Tabata* v. *Murane,* 24 Cal.2d 221 [148 P.2d 605], and cases cited p. 224; 20 Cal. Jur. § 7, p. 907.)

The item of $2,250 represents a balance of unpaid salary at the rate of $750 per month owing to Oscar for the last three months of his life, February, March, and April, 1929. Apparently it was the practice of the corporation to pay Oscar $500 on account of his salary each month from the regular payroll, and to credit the balance of $750 to his account, said sum being used to cover the monthly payments to Quinn. In December, 1926, Oscar's account was credited with a single lump sum which included $9,000 to cover the retroactive $750 monthly increase in salary for the year 1926. In March, 1927, his account was credited with $2,250, representing $750 per month for the months of January, February, and March, 1927. On March 9, 1927, a duplicate payment of $750 was made, apparently representing an overpayment for that month. Thereafter, from and including April, 1927, to and including January, 1929, Oscar's account

was credited each month with $750. But there were no credits of $750 per month for the months of February, March, and April, 1929, nor had the indebtedness to Quinn been extinguished at the time of Oscar's death on April 26, 1929. The trial court found that the $2,250 for said three months was due Oscar and that it was never paid or credited to him.

The burden of proving that the sums had been paid rested upon the corporation (*Lloyd* v. *Kleefisch,* 48 Cal.App. 2d 408, 415 [120 P.2d 97]), and the evidence sufficiently supports the trial court's conclusion that this burden was not met. Even if it be assumed that there was a presumption that the ordinary course of business was followed (Code Civ. Proc., § 1963, subd. 20) and payment made, the presumption was sufficiently overcome by supporting evidence of nonpayment found in the state of the book entries and the inability of the auditor to make a satisfactory explanation. The fact that an apparent overpayment was made in March, 1927, two years prior to the period here in question, did not require the trial court to make an allowance for that item. The payments in question were those for the stated three months of 1929. No general matter of accounting was at issue. Neither was it incumbent upon the trial court to prorate the salary and allow the corporation a credit for the last three days of April, 1929. The practice was to make payment to Oscar in advance of the end of the month, and had payment thus been properly made, it is inconceivable that the corporation would have presented a claim for refund to cover the last four days of the month after Oscar's death. We hold that the findings of the trial court on this point have sufficient evidentiary support.

The $5,000 item represents cash which the trial court found was advanced to the Oakland branch of the corporation and improperly charged to Oscar's personal account on the corporate books. The charge was made in a negative manner through failure to credit Oscar's account with repayment of the $5,000 to him by the corporation, but instead entering, under date of March 31, 1929, a $5,000 credit to the account of Josephine, purportedly representing repayment of a loan made by her to the corporation. On the books of the Oakland branch it appears that a credit was originally given to Oscar for the loan, but at some later date his name was scratched out and that of the Bear Film Company was

inserted over it. Plaintiff was able to produce the transcript of Oscar's bank account for this period, showing a $5,000 check drawn by Oscar practically contemporaneous with the date of the Oakland entry. The check itself was not produced, nor was it established to whom it was drawn. No check for that amount drawn by Josephine was produced and she had no bank account of that amount at the time. Although the auditor testified that the erasure of Oscar's name was made at his direction before his death, and the evidence showed other changes made by the auditor to correct errors of the bookkeeper, the testimony of the auditor as to the $5,000 item is impeached by the court's finding that, in connection with the $10,000 item, entries of the same date, March 29th, were not regularly or properly made, but were inserted after Oscar's death, and did not correctly show the transactions they purported to set forth. The trial court weighed the evidence and concluded that the $5,000 was actually advanced to the corporation by Oscar and never repaid by it to him. This finding has sufficient support in the evidence and the reasonable inferences which may be drawn from it.

After Oscar's death an action was commenced by the Bear Film Company against the administrators of Oscar's estate to determine the interest, if any, of Oscar's estate in the Oakland branch. In that case a decree was entered determining that the Oakland business was in fact a branch of the corporation and not a personal venture of Oscar. In the present action the trial court reexamined the question and came to the same conclusion. As part of the decree in the first suit against the administrators, the plaintiff corporation was ordered to pay the defendant administrators $644.46 ''salary due to the said Oscar . . . at his death and when such sum is so paid . . . it shall constitute a full and final settlement of the matter herein between the above named plaintiff and defendants as administrators. . . .'' Appellants claim that this judgment is res judicata of the $5,000 item. But the parties to the first action were the Bear Film Company, at that time dominated and controlled by Josephine, on the one side, and Josephine, as administratrix of Oscar's estate with Uhle, on the other side. Mr. Uhle testified that he made no independent investigation of the assets of the estate. Under these circumstances the judgment could not conclude plaintiff, as Oscar's successor in interest.

█ Lastly, there is the $10,000 item. This award also rests upon the trial court's conclusion that the books of the corporation were changed after the death of Oscar so that they failed to reveal the amount in which the corporation was then indebted to him, which was $23,152.88, or $18,950 in excess of the sum paid over to his estate.

In December, 1926, pursuant to resolution, a $10,000 bonus was voted to Oscar and appropriate book entries were made. The same practice was followed in December, 1927, and 1928, except that in these two years the bonus was taken without corporate resolution. The corporate income tax prepared in 1929 reported the declaration of the bonus, and Oscar returned the $10,000 as income on his personal tax report. Subsequent to Oscar's death, and under an entry date of March 29th, the auditor made a journal entry crediting Oscar with $10,000, and then an entry debiting his account with the same amount as "Refund of Bonus. Year 1928—as per minutes Mar 29—1929—." The purported minutes of March 29th referred to in this entry recite that Oscar stated that he wished ". . . to return the Bonus of $10,000.00 voted him for the year 1928, as the Company was short of ready funds, and he wishes to make other investments for the Company, which he hoped would be more beneficial. . . ."

The minutes then show the adoption of a resolution accepting this proffered refund. The minute book also contains the purported minutes of a meeting of December 31, 1928, reciting the adoption of a resolution that the "customary yearly bonus of $10,000.00" be paid to Oscar. The evidence is in conflict as to whether such a meeting was held on December 31st. The purported minutes were typed after Oscar's death and pasted in the minute book to justify the position of the corporation in a dispute with the federal income tax authorities over its deduction of the $10,000 in its income tax return.

The employee who typed the minutes of both of the purported meetings at one point testified that the minutes of March 29th were dictated to her by Albert after Oscar's death, but this statement was shaken by contradictions on cross-examination, and it was also contradicted by the testimony of the then secretary and the auditor of the corporation and by an expert on disputed documents. However, the trial court chose to believe the statement.

Questions as to the credibility of witnesses and the weight to be given their testimony are for the trier of the facts. As said in *Turner* v. *Whittel,* 2 Cal.App.2d 585, 588 [38 P.2d 835]: ". . . Although impeaching evidence in the nature of contradictions or otherwise has been received, it is still the right as well as the duty of the jury to determine to what extent they believe or disbelieve the testimony. (*Estate of Gird,* 157 Cal. 534 [108 P. 499, 137 Am.St.Rep. 131]; *Secondo* v. *Secondo,* 218 Cal. 453 [23 P.2d 752].) They may likewise give credence to a witness who has falsely testified in part (*Robinson* v. *Robinson,* 159 Cal. 203 [113 P.155]), or whose testimony contains contradictions or inconsistencies. (*Bitsekas* v. *Parechanian,* 67 Cal.App. 148 [266 P. 974].) An appellate court is not concerned with the question of the preponderance of the evidence but with the single inquiry whether the record contains substantial evidence tending to support the findings assailed. (*Hotaling* v. *Hotaling,* 187 Cal. 695 [203 P. 745]; *Johnson* v. *Risdon,* 89 Cal.App. 768 [265 P. 505].)''

In the evidence as a whole there is sufficient support for the findings of the trial court to the effect that the corporate books were altered after the death of Oscar so that they would not reveal the true amount of the corporate indebtedness to him; and that the minutes of the purported meeting of March 29th were prepared and the improper entries in the books were made by employees of the corporation acting under the orders and directions of the person in control after the death of Oscar, for the purpose of depriving his estate of the money represented by said entries.

The record in this case is voluminous. The evidence bearing upon the principal issues is largely indirect or circumstantial. The conclusions reached by the learned trial judge were based upon inferences fairly deducible from what he saw and heard during the progress of the trial. There is abundant evidence of design on the part of Josephine and Albert to conceal from plaintiff and her mother the true state of Oscar's financial affairs. In this state of the case we cannot say that the trial judge was not justified in concluding as he did that the stock transfers made by Oscar to Josephine were in trust for him, and that he retained the equitable and beneficial interest therein. This conclusion seems reasonable and probable in light of the disclosures

relative to the conduct of the parties involved. The remaining issues involve largely matters in the nature of accounting and there is ample evidence to sustain the conclusions reached by the trial court thereon.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Peters, J. pro tem., concurred.

Appellants' petition for a rehearing was denied June 3, 1946. Edmonds J., and Traynor, J., voted for a rehearing.