[Civ. No. 14166.   First Dist., Div. Two.   June 5, 1950.]

THURMAN G. CASEY, Appellant, v. MINNIE   CASEY, Respondent; MYRTLE BELL, Intervener.

MINNIE CASEY, Respondent, v. THURMAN G. CASEY et al., Appellants; MYRTLE BELL, Intervener.

Frederick J. Schoeneman and John E. Willard for Appellants.

Franklin C. Stark, Carl E. Simon and Stark & Champlin for Respondent.

THE COURT.—This is an appeal by Thurman G. Casey from a judgment deciding and ordering in substance that appellant owns the disputed rooming and apartment house at

591 24th Street in the city of Oakland subject to a life estate in his sister Minnie Casey, that she recover the possession of the premises from him, that he be enjoined from interfering with her rights, that he is not entitled to an accounting for rentals received by her or to the rental value of an apartment occupied by her, but that she recover a certain amount for rentals received by him and for costs. Separate actions were instituted by Thurman and Minnie against each other and Minnie filed a cross-complaint in the action instituted by Thurman. Myrtle Bell, a sister of the parties, intervened in both actions, which were consolidated, claiming a partial remainder interest after Minnie's death, but she did not appeal from the judgment which ordered that she take nothing. She is not concerned in this appeal. The parties will hereinafter be indicated by their first names only.

On April 23, 1942, Lillian Barnard, a widowed sister of the parties, conveyed the apartment house to Thurman by simple grant deed delivered to him and recorded. No consideration is stated and it is conceded that none was given. At the time of the transfer Lillian Barnard, herein further called Lillian, and her sister Minnie were living on the premises which Lillian had obtained from her husband Charles Barnard, at his death in August, 1931. In 1929 when Charles was an invalid and Lillian in frail health, Minnie at her request gave up her millinery business in Pleasanton, California and together with the mother of the parties who had lived with her moved to the apartment house. From then on she helped to care for Charles, mother Casey and Lillian until their deaths respectively in 1931, 1937 and 1945. Minnie had a little income of her own, some small investments; Lillian's source of income was the apartment house. They shared the food bills and Minnie paid $5.00 a month on the utilities, but otherwise paid no rent. She also assisted in the care of the rented rooms and apartments. The relation of the two sisters was very close. Whether the property was conveyed in trust for them during their lives or as an outright gift to Thurman was the main point in dispute and the sole one remaining on appeal.

Thurman was the only one of their brothers living in the bay area. They considered him as wealthy and the "business head" of the family. He visited Lillian regularly and often, and helped her out in many things. He paid the taxes for the sisters with money they gave him. Lillian leaned on him for help and business guidance, increasingly so after the death

of her husband, and had implicit trust in him. The fact that Lillian gave Thurman the deed to the property did not change the factual situation. The sisters continued to live in the house, to rent rooms and apartments and to give service to the tenants; Lillian collected the rentals and returned them in her own income tax returns to the knowledge of Thurman; what she saved from the rentals she placed in a bank account in the joint names of herself and Thurman. At her death in 1945 Thurman paid the funeral expenses and other bills from it and divided the balance up between the surviving brothers and sisters. Minnie remained in possession of the property and continued its management after Lillian's death. She paid all expenses except the property taxes and insurance. She let Thurman know that she had the tax money available but he did not accept it and paid the tax himself. Thurman did not receive any rental or profit before March, 1948. Minnie did not account to him. She, not Thurman, paid income tax on the profits of the apartment house. He had no key to the premises and never asked for one; in March, 1948, he obtained one by having a duplicate made of the key of one of the tenants. At this same time he took over the management of the property; handed written notice to the tenants informing them that if they paid rent to Minnie they would have to pay again to him, started collecting rentals, asked for a rental of $75 a month from Minnie, paid for maintenance and upkeep, put new tenants into the place, changed door knobs, in short acted as if he were entitled to possession. The preceding facts are undisputed and the evidence in that respect is without conflict.

Moreover much testimony of declarations made by Lillian both before and after the transfer, not in the presence of Thurman, was received over objection from Thurman and subject to motion to strike. The declarations were offered for limited purpose only, all of them to show Lillian's state of mind at the time of each declaration for the purpose of inferring her state of mind at the time of the act and those preceding the deed, also to show what she intended to do for the purpose of inferring that the intention was carried out. The motion to strike was denied in the judgment. Many witnesses testified to various declarations to the effect that Lillian wished to take care of Minnie and wished her to have the house as a home and the income from it for life; that she had told her wishes to Thurman to whom she would give a deed and who would take care of it, and later that she had deeded it to

Thurman "with the understanding" that he would take care of it during her and Minnie's life and that Minnie would have a home and the rentals; that the house was better in the hands of Thurman who was a businessman and who could protect them against Lillian's stepdaughter, a daughter of Charles by a former marriage, who thought herself entitled to have the house that had belonged to her father and who repeatedly had bothered Lillian about her pretended rights; that she thought Minnie a poor businesswoman and not a good enough fighter to cope with the stepdaughter. Minnie's testimony was to the same effect and moreover among other things that Lillian had always promised her the house; that Lillian had discussed the deeding to Thurman with her both before and after it took place; that they had agreed that it was the best thing to do; that they would be safe and that it would stop the stepdaughter from nagging; that prior to March, 1948, Thurman had never objected to her receiving the rentals nor asked for a portion of them, nor discussed the ownership of the house with her.

Thurman testified that Lillian during one year or more prior to the making of the deed had told him what her intentions were, every time the same; she wanted him to have the property; the day of the deeding she asked him to keep it secret from Minnie who might disagree; from the time of the deed the house was his with no strings attached to it; he could have taken possession of it and have had all the rentals. However on appeal he concedes that Lillian retained a life interest and he does not attack a finding to that effect. There were several discrepancies in his testimony and especially between his testimony at the trial and his prior deposition. With respect to Minnie he testified that after Lillian's death he proposed that she should manage the house for him and that they should agree concerning the division of the rentals; that Minnie accepted this but never accounted or made an agreement and finally in March, 1948, definitely refused.

The main contention on appeal is that the trial court erred in admitting over objection the alleged declarations of the grantor because they were hearsay and not admissible under any exception to the hearsay rule. There are recognized exceptions to the hearsay rule which in this state are considered to cover the admissibility of said declarations.

In *O'Dea* v. *Hibernia Savings & Loan Soc.*, 119 Cal.App. 622 [7 P.2d 318], the question was before us whether parol testimony of declarations of the deceased made after the execu-

tion of the instrument were admissible to show whether an order for the transfer of money in a savings bank account to the plaintiff was intended as a gift or only to enable plaintiff to withdraw the amounts necessary for the care of the deceased. It was claimed that such testimony was incompetent as in disparagement of the written document. We held applicable the "well-recognized exception to the rule that, when the intention or state of mind of the alleged donor is involved, evidence of declarations made by him before or after the transaction is admissible though the declarations were not made in the presence of the adverse party."

In the later case of *Whitlow* v. *Durst,* 20 Cal.2d 523 [127 P.2d 530], Justice Traynor stated the general rule thus: "When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving." It is specifically mentioned in the opinion that the rule is applicable in gift cases. Since then the rule has been applied in two cases, the facts of which are sufficiently like those before us to be in point as direct authorities. In *Katz* v. *Enos,* 68 Cal. App.2d 266 [156 P.2d 461], decedent had during his stay in a hospital for an operation executed a gift deed of certain real property to his sister. It was found nevertheless that the property was conveyed to the sister in trust for the limited purpose to raise money thereon to pay the expenses of the operation. Division One of this court held that testimony of decedent's attorney as to declarations of decedent after he left the hospital were correctly admitted over objection based among others on the grounds that it was hearsay and offered in disparagement of a deed made by the declarant.

In *Hansen* v. *Bear Film Co., Inc.,* 28 Cal.2d 154 [168 P.2d 946], decedent had executed an instrument in writing which stated that for value received he transferred and assigned all his right, title and interest in his shares of preferred stock of the Bear Film Company to his mother, reciting that he intended to vest such title absolutely in her. Instrument and stock certificates had been delivered to her and the transfer entered in the stock books of the corporation. It was nevertheless found that the transfer was made upon her express oral promise and agreement that she would hold the stock in trust for decedent to be transferred back to him at his request. Quoting as authority *Whitlow* v. *Durst, supra,*

the Supreme Court held that oral and written declarations of ownership of the stock and of the company made by decedent not within the presence or to the proved knowledge of his mother but subsequent to the transfer to her and in derogation to it were correctly admitted in evidence "on the issue of a claimed gift, and also to show the intent or state of mind of (decedent)." The court also quoted section 38, subdivision 3, of the Restatement of Trusts, reading: "If the owner of property transfers it inter vivos to another person by a written instrument in which it is not declared that the transferee is to take the property for his own benefit or that he is to hold it in trust, extrinsic evidence may be admitted to show that he was intended to hold the property in trust either for the transferor or for a third party."

The deed in the present case, which contains nothing more than the mere grant, comes evidently under the above rule. Although the statute of frauds has not been invoked it may be pointed out that even when the requirements of the statute are not complied with the transferee will hold the interest in the realty upon a constructive trust for the intended beneficiary if, as is here the case, the transferee at the time of the transfer was in a confidential relation to the transferor (Restatement, Trusts, § 45(1)(b); *Cooney* v. *Glynn,* 157 Cal. 583 [108 P. 506]; *Smith* v. *Lombard,* 201 Cal. 518, 526 et seq. [258 P. 55]; *O'Brien* v. *O'Brien,* 50 Cal.App.2d 658 [123 P.2d 877]). In this case all the declarations in dispute, both prior and subsequent to the grant, were under the cited authorities admissible to show the intent or state of mind of Lillian and on the issue of the outright gift claimed by Thurman.

The testimony as to declarations of Lillian prior to the grant to the effect that she intended to give Thurman a deed with the understanding that he would take care of the property and Minnie live there and have the income the rest of her life seem also admissible to prove that the deed was actually given with such understanding. The doctrine that declarations of intent to do and act are admissible to prove that the act thereafter was done, for which doctrine *Mutual Life Insurance Co.* v. *Hillmon,* 145 U.S. 285 [12 S.Ct. 909, 36 L.Ed. 706], is the leading case, is fully accepted in California. (See *People* v. *Alcalde,* 24 Cal.2d 177, 185 et seq. [148 P.2d 627]; McBaine, *Admissibility in California of Declarations of Physical or Mental Condition,* 19 Cal.L.Rev. at p. 367 et seq.) However we need not rest our decision on that rule of which no

application to a situation similar to the one before us has been cited to us; the evidence as to the declaration of Lillian considered solely with respect to her state of mind, together with the other circumstantial evidence stated, so clearly support the findings of the trial court that even if admission of prior declarations under the rule of the Hillmon case should have been erroneous here, such error would have been without prejudice. For the proof of a transfer in trust no proof of what was said at the transfer is required. As early as *Gunter* v. *James,* 9 Cal. 643, 655, it was held that the existence of an express trust could be proved by the circumstances. In *Hansen* v. *Bear Film Co., Inc., supra,* 28 Cal.2d 154, 168-169, the finding of an express oral promise and agreement to hold in trust was upheld, solely on inferences from the circumstances, behavior and posterior declarations of transferor and transferee without any indication of what was actually spoken between them. In the present case such evidence is also satisfactory. The fact that the property deeded was Lillian's only livelihood and that Thurman left her in possession and enjoyment until her death were strong indications of a trust relation, though such was expressly denied by Thurman at the trial. The incredible position taken by him in this respect together with the discrepancies in his testimony justified the trial court in believing Minnie and disbelieving Thurman where their testimony was in conflict. The circumstances and behavior so proved are in harmony with Lillian's intentions as shown by the declarations testified to. The above also disposes of appellant's contention that the decision lacked evidentiary support.

◼ Appellant contends that some of the declarations admitted in evidence were too remote in time to be admissible. ''Ordinarily remoteness affects the weight of the evidence rather than its admissibility. (*Jameson* v. *Tully,* 178 Cal. 380 [173 P. 577].) The determination of the question whether evidence is or is not too remote is for the determination of the trial court and it is clothed with wide discretion in this regard. (*Estate of Warner,* 167 Cal. 686 [140 P. 583].)'' *Moiola* v. *Paggi,* 5 Cal.App.2d 279, 281 [42 P.2d 331].) Here the court excluded declarations more than one or two years prior to the deed. Thurman testified that during such period Lillian had spoken about her intentions with him, always in the same manner. To admit her expressions to others during that period was no abuse of discretion.

◼ Appellant points out that no fraud of Thurman was

found by the court and argues that therefore there can be no constructive trust. The court made findings to the effect that Thurman stood to Lillian in a confidential relation, that he accepted the deed with the knowledge and on the understanding that Lillian and after her Minnie should have the beneficial life interest in the property and that on or about March 1, 1948, he ousted Minnie and assumed absolute ownership in contravention of the trust upon which he held the premises. This is all that is required. "It is the violation of the parol promise which constitutes the fraud upon which the trust arises." (*Cooney* v. *Glynn, supra*, 157 Cal. 587; *Svistunoff* v. *Svistunoff*, 94 Cal.App.2d 651 [211 P.2d 352].) Moreover it is a matter of indifference whether it be said that Minnie is seeking to enforce a voluntary trust which has been repudiated by the trustee or whether she is seeking to enforce an involuntary trust arising in law from that repudiation. (*Bradley Co.* v. *Bradley,* 165 Cal. 237, 240 [131 P. 750].)

Judgment affirmed.