[Crim. No. 2980. First Dist., Div. Two. May 17, 1954.]

THE PEOPLE, Respondent, v. ROY E. MacARTHUR,
Appellant.

Benjamin F. Marlowe for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Victor Griffith, Deputy Attorney General, J. F. Coakley, District Attorney (Alameda), and Robert H. McCreary, Assistant District Attorney, for Respondent.

KAUFMAN, J.—Appellant, Roy E. MacArthur, appeals from a judgment of conviction after jury trial. The information charged him with five violations of section 11500 of the Health and Safety Code, each of the first four consisting of the sale of a narcotic [heroin], two on March 31, 1953, one on April 11 and one on April 22, 1953. The fifth count was for furnishing a narcotic [heroin] on April 11, 1953. A verdict of guilty was returned on all five counts. Motion for

new trial was denied and defendant was sentenced to the state penitentiary on each count, the sentences to run concurrently.

The Bureau of Narcotic Enforcement of the State of California had on March 24, 1953, in its office in the State Building, San Francisco, received information from a narcotic peddler by the name of Jimmy Lee, that appellant MacArthur was his chief source of supply. On that same date at approximately 8 o'clock in the evening the informer introduced Inspector Chasten to appellant, the inspector using the alias of ''Tony.'' Appellant stated that he wanted to sell a pound of heroin for $8,000, that he was leaving for the Orient on about April 1st and would return about April 11th with the heroin. Appellant was a pilot for Transocean Airlines and had been making both passenger and cargo flights to Tokyo, Japan, since October, 1952.

On March 30, 1953, appellant informed Inspector Chasten as to the procedure that would be used in making their deals. They would both go to a certain hotel and each get a room, and then follow a certain method as to the exchange. Chasten testified that appellant told him that he had been bringing in heroin for a year and a half and had an excellent method of concealing it in a plane, that he considered his chances of getting caught about 1,000 to 1. MacArthur said that he would telephone the inspector when he returned from his trip.

On March 31, 1953, the informer, Lee, introduced Inspector Mantler of the State Bureau of Narcotics to appellant under the pseudonym of ''Jimmy Allen.'' Appellant gave Mantler 245 grains of heroin for the sum of $250 in cash in state funds which he received from Mantler. The foregoing transaction is the basis of count one of the information.

The second count for sale of a narcotic resulted from another transaction on the same date when Mantler and MacArthur met again that evening. Appellant said he did not like small deals, that he could go to jail for $250, $2,500 or $5,000. He told Mantler that he was a pilot, that he flew to Tokyo himself, that ''You are dealing right at the top.'' Appellant said he was going on a ''try'' the next day and would be back in eight or ten days. The second sale of 200 grains of heroin was made for $250.

Between April 1 and 10, 1953, appellant flew to Tokyo from Travis Air Base and returned.

On April 11, 1953, appellant sold Mantler 190 grains of heroin for $250 which constituted the third count of the

information. As in the earlier transactions, state funds were used and the serial numbers recorded. Upon his arrest some days later two of the fifty-dollar bills used in this transaction were found in his wallet. Appellant said he would like Mantler to take more heroin, that he had 3 ounces which he would sell for $1,500. Mantler said he would call him at the end of the week.

On April 11, 1953, Inspector Chasten, using the name of Tony, telephoned MacArthur, who said that he was just about to call him. They arranged to meet in about one hour at the bar of a certain hotel in Oakland. After they were seated at a table in the bar appellant said he had not been able to procure the pound of heroin because the plane layover in Japan wasn't long enough for him to make the necessary negotiations for that amount, since the Chinese with whom he dealt would have to travel to Osaka by train to secure it. In order to show that he was able to get good, pure heroin he would get him a sample. He left and returned shortly, whereupon he and the inspector went to a hotel room where he gave Chasten a small sample from a large package. The sample contained about two grains of heroin. [The fifth count, furnishing a narcotic.] Chasten showed him the $8,000 which he had available for a larger purchase, and defendant said he was satisfied.

Appellant and Inspector Chasten met again at the same hotel in Oakland on April 14, 1953. Chasten told appellant that he was worried because some prominent persons had been arrested in San Francisco, and that he had heard that a pilot had been offering heroin for sale in San Francisco, and that there might be a connection. The appellant said that there was no cause for worry, since he was dealing only with Bill, a bartender, and a fellow named Jimmy, and that he had full control of the course in Japan. He said he could send another person to pick up the heroin through the use of a password. He had to eliminate one fellow who had not handled the heroin properly, and Bill and Jimmy were also to be eliminated in the future. Appellant said he would then deal only with Chasten. They had a conversation as to working up a partnership, selling 4 pounds per month and splitting the profits. Appellant thought that the pound of heroin he had not been able to get in Japan might come in on another plane in two or three days, and that it was simple for him to get the heroin off the plane at Travis Air Base

because his uniform and credentials permitted him to enter and leave at will.

On April 20, 1953, defendant telephoned Chasten at 2 p. m. Chasten arranged to meet him at the same hotel in Oakland. Appellant informed Chasten that the pound of heroin had not come in on the other plane, but that he had received 1½ ounces. He wanted Chasten to cut this to 6 ounces and sell it for $500 per ounce, returning the $3,000 to appellant who would use it to finance their partnership and pay for the heroin in Japan. When they had arrived at the point where they were making $64,000 from 4 pounds of heroin per month, they could soon retire as wealthy men.

The following morning Chasten informed appellant by telephone that he had a buyer from Alaska who would take all he could get. Appellant said he had some that was good but not pure. Chasten said for him to get together what he could and he would call him the next morning.

On April 22, 1953, Chasten talked on the telephone with appellant and asked if he was ready. He said that he was and they agreed to meet at Andy's Drive-In at 19th and Harrison Streets, Oakland. Inspector Chasten parked his car in the drive-in parking lot. Several law enforcement officers were waiting inside the drive-in, and a photographer was following the movements with his camera from a building across the street. Chasten and appellant got into Chasten's car where appellant sold four packages of heroin containing 950 grains to Chasten and received $700 in state currency, the serial numbers of which had been previously listed. This incident furnished the basis of count four.

Appellant was then arrested and asked where he got the $700 which was found in his shirt pocket. He stated that he was a pilot, a working man, and that is where he got it. The inspector took appellant to his apartment in Oakland where Inspector Noel of the State Narcotics Bureau asked him if he had been bringing heroin in from Japan, and appellant admitted that he had been picking it up in Tokyo. He told Noel that he had become involved in the traffic through a Chinese girl whom he knew in Tokyo, that she had suggested it as a way of making a lot of money and that she had a friend who had heroin to sell. Later at Oakland city hall in the prosecuting attorney's office Noel asked appellant in the presence of Chasten if he had peddled heroin to anybody else and he said "No," but when Mantler walked in he said, "Well, you know all about him."

Appellant at the trial denied that he had made the statements testified to by Mantler, Chasten and Noel. The defense was entrapment. Appellant admitted the five specific transactions involving narcotics but contended that the idea of selling narcotics had never occurred to him until he was induced to do so by Jimmy Lee, the informer in the case, that he first met Lee in January of 1953, and that later in March he induced him to deliver narcotics for him as he had contacts which he couldn't follow through, that he needed somebody to help him keep in the background. Thus the deals with the inspectors were arranged, and appellant asserted that these were the only narcotic transactions he had ever participated in. Appellant said that he had been averaging $600 per month as a pilot and an additional $125 per month working as bartender.

 It is to be noted at the outset that appellant's opening brief containing four arguments for reversal, contains not one citation of an authority other than two sections from the Penal Code. This court could, if it wished, refuse to consider such a brief. (See *People* v. *Gidney,* 10 Cal.2d 138 [73 P.2d 1186]; *People* v. *Jenkins,* 118 Cal.App. 115 [4 P.2d 799]; *People* v. *Titus,* 85 Cal.App. 413, 418 [259 P. 465].) However, we will review the contentions urged.

 It is first contended that appellant was not accorded an impartial trial because perjury was committed by Inspector Noel of the State Narcotics Bureau in order to negate the offense of entrapment. On cross-examination Noel testified that he had received information from a United States Customs officer by the name of McSheehy; that Customs believed they had located the source of MacArthur's supply; and that they had further information with respect to his activities and associates. Attached to the opening brief is an affidavit by Benjamin F. Marlowe, counsel for appellant, in which he avers that he called (presumably telephoned) the United States Customs Office in San Francisco inquiring whether they or any branch of the federal government concerned with investigations of narcotics was investigating the activities of Roy E. MacArthur, and whether said Customs Office had given Inspector Louis Noel any information that they had located or believed they had located MacArthur's source of supply in Japan; that he was informed that they had no record that Roy E. MacArthur was being investigated by them or any branch of the federal government interested in narcotic cases; that they had not directly or indirectly given

Louis Noel information that they had located appellant's source of supply in Japan or that they were investigating him; that the only information they had was that received from the State Narcotics Bureau. Affiant concludes by stating that he received this information at 1:57 p. m. on August 27, 1953, from "as best as can be recalled by affiant" Mr. *Joseph Sheehan* of the United States Customs Office, San Francisco. This affidavit proves nothing as to whether Mr. *McSheehy* of the Customs Service did or did not make a certain statement to Noel. If counsel for appellant believed he had evidence to show perjury, on the part of a witness, he should have presented that evidence to the trial court. On the motion for new trial he presented only a rumor. He then said he had indirect word that Noel had perjured himself, and that if this information could be verified, Noel deliberately committed perjury. At this point, counsel has still not verified the rumor. It is ridiculous to offer an affidavit such as presented here, which is not made by the person alleged to have made the statement. Furthermore, affiant isn't even positive as to who he received the information from. He does not identify the position of the person named, stating only that "as best as can be recalled" he was Joseph Sheehan of the United States Customs Office, San Francisco. If there is anything in the contention of perjury, no excuse is shown why it could not have been investigated and have been presented to the trial court on the motion for new trial. (*People* v. *Lewis*, 105 Cal.App.2d 208 [233 P.2d 30]; *People* v. *Hall*, 25 Cal.App.2d 336 [77 P.2d 244]; *People* v. *McCoy*, 58 Cal.App. 534 [208 P. 1016].)

Appellant contends that the trial court committed prejudicial error in rulings on the admissibility of evidence in certain instances.

■■■ The defense attempted to show appellant's ignorance of narcotics and the value thereof by his alleged attempt to sell $50,000 worth of narcotics for $700, that he took that amount for 950 grains because he was so instructed by the operator. Inspector Mantler was asked if he knew of any dealer who knew his business who sold $50,000 worth of narcotics for the sum of $700. The court sustained the objection on the ground that it was not material, saying, "We don't know what kind of a market we have here, whether it is an open market with a reasonable time to find a willing buyer, ready and willing to purchase, or what it is. That is,

bootleg materials that way are whatever you can get for them, whatever you think you ought to have.''

 Materiality is a question of law, and the trial judge has a wide discretion in determining admissibility. (*Decter* v. *Stevenson Properties, Inc.*, 39 Cal.2d 407 [247 P.2d 11].)

 It is to be noted that Inspector Mantler was testifying, and he had just stated that in the bootleg market locally heroin had been selling between $300 and $600 an ounce, and an ounce is a little less than 500 grains. On the basis of this testimony then, the 950 grains sold by appellant for $700 would be worth about twice the value of 500 grains, or between $600 and $1,200. It cannot be said that the trial court abused its discretion in sustaining this objection. (See *Jennings* v. *Arata*, 83 Cal.App.2d 143 [188 P.2d 298].)

 Appellant assigns as error the overruling of his objection to the conversation by Inspector Chasten that he stated to appellant that two prominent narcotic peddlers were arrested in San Francisco and that he had heard something about a pilot offering a pound of heroin for sale. The objection was that it was hearsay. The trial judge agreed that it was, but said that it was a conversation the witness had with defendant, that it might be preliminary to something else. The inspector said he wanted to know if defendant was being careful. It was very clear from the conversation related that the statement was made to secure further information from the appellant by the inspector. It was not offered for the truth of the matter in the statement. It was therefore unobjectionable. (*Gursey* v. *Campus Camera Shop, Inc.*, 98 Cal.App.2d 257 [219 P.2d 884].)

It is contended that error was committed when on cross-examination objection was sustained to a question of appellant's counsel by which in examining Inspector Chasten, he attempted to show appellant's lack of assets, that he owned an old model car, paid for his TV on the installment plan and did not own any property. The trial judge has wide discretion in determining the relevancy of evidence. (*Spolter* v. *Four Wheel Brake Service Co.*, 99 Cal.App.2d 690 [222 P.2d 307]; *Gladstone* v. *Fortier*, 22 Cal.App.2d 1 [70 P.2d 255].) Whether or not evidence is too remote is for the trial court which is vested with a wide discretion in making such decisions. (*Casey* v. *Casey*, 97 Cal.App.2d 875 [218 P.2d 842].) Without objection, the witness had just previously been asked ''And you found out he owned a very late model of a 1937—withdraw it. It wasn't quite

so new. It was a 1935 De Soto, isn't that right?" to which the witness answered, "I don't recall." Just following this the court said: "What has that got to do with the issues involved here, whether he had a bicycle or an automobile or traveled on foot or in an airplane?" to which appellant takes exception as being facetious and intending to ridicule defendant.

■ Again appellant alleges error in sustaining objection to a question on cross-examination designed, he says, for the purpose of attacking the *credulity* [probably means credibility] of Inspector Chasten. He was asked if he reported back to the United States Customs that he had learned that defendant had been dealing in narcotics for a year and a half. Chasten was an inspector with the State Narcotics Bureau. Whether or not he reported this matter to the United States Customs would seem to have no bearing on his credibility as a witness. Chasten was not shown to be the Chief Officer of the San Francisco Branch of the Narcotics Bureau, nor was any duty shown to exist on the part of any state officer to make such a report.

An examination of the arguments to the jury discloses no merit in appellant's claim that the prosecution's argument was calculated to inflame the minds of the jurors against appellant. The claim that perjured testimony was given by one witness for the People has been dealt with previously. It is therefore unnecessary to discuss appellant's claim that improper argument was based on alleged perjury. ■ In argument an attorney may fairly reason from the evidence adduced at the trial and express opinions based on deductions or reasonable inferences therefrom. (*Rodgers* v. *Foppiano*, 23 Cal.App.2d 87 [72 P.2d 239].)

■ A reversal is not warranted in cases where counsel simply assigns remarks as prejudicial and requests no instruction where the effect of such remarks may be cured by a proper instruction of the court. (*People* v. *Davidson*, 23 Cal.App.2d 116 [72 P.2d 233]; *People* v. *Charlie*, 34 Cal. App. 411 [167 P. 703].) The court in the present case upon motion for new trial was satisfied that appellant had had a fair trial. The trial judge could more accurately determine than can an appellate court, the effect of alleged misconduct of the district attorney. (*People* v. *Sarazzawski*, 27 Cal.2d 7 [161 P.2d 934].)

Appellant criticizes the fact that Jimmy Lee, the informer, was not brought in as a witness, and that the testimony as

to what Jimmy Lee told the agents is hearsay. There was evidence offered by respondent that Jimmy Lee had disappeared, that the state agents had been looking for him from time to time, but could not locate him. Counsel for appellant brought out the testimony in cross-examining Inspector Noel that Jimmy told the state agents that MacArthur was his chief source of supply for narcotics. He also brought out fully that the agents using Lee as a decoy, had laid a plan to apprehend appellant in order to prosecute him for trafficking in narcotics.

It is only where the criminal design originates in the mind of an officer and not with the accused, that there is entrap- ▮▮▮▮ ▮▮ The law does not frown upon the entrapment of a criminal, but upon the seduction of an innocent person into crime by a law enforcement officer. (*People* v. *Roberts,* 40 Cal.2d 483 [254 P.2d 501].) For other cases where a decoy was used to apprehend criminals, but where the decoy was apparently not a witness in the case, see *People* v. *Gelardi,* 77 Cal.App.2d 467 [175 P.2d 855] ; *People* v. *Alamillo,* 113 Cal.App.2d 617 [248 P.2d 421] ; *People* v. *Lagomarsino,* 97 Cal.App.2d 92 [217 P.2d 124].

There is no merit in appellant's final contention that the verdict is not supported by competent evidence. A review of the record establishes that it is adequately supported, and on appeal all intendments must be indulged which tend to support the judgment. (*People* v. *Hatton,* 114 Cal.App.2d 195, 196 [249 P.2d 901] ; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].)

There being no prejudicial error in the record the judgment of conviction must be affirmed.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied June 1, 1954, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1954.