FORD, P. J.
 

 This appeal presents the question as to whether the trial court’s determination that the defendant Belle Wiley Young holds in trust an undivided one-half interest in certain acreage in San Marino and must convey that interest to the executor and executrix of the estate of. May Wiley Adams, deceased, has substantial support in the record when viewed in the light of the applicable law. The action was brought by Wiley B. Adams, individually and as cóexecutor of the will of May Wiley Adams, deceased, his mother, against Belle Wiley Young, individually and as co-executrix of the will of May Wiley Adams, deceased, her sister.
 

 Belle Wiley Young, and May Wiley, Adams were twin sisters, bora on May 27, 1880. Their mother was Nellie. Wiley. Mrs. Wiley died .on.May 27, 1924.."May married Burton.G. Adams] on May .25-, "190.4.. The plaintiff. is .their. only, 'child. Biirton G. Adams "died on or about July 2, 1940. .He and-May
 
 *146
 
 Wiley Adams had then been separated for approximately twenty years. Belle married Edward R. Young in 1907. Mr. Young died in 1955. May Wiley Adams died on June 30, 1961. The present action was commenced on February 25, 1963.
 

 The evidence covered a span of time of more than half a century. The property involved is a parcel of approximately 5 acres in San Marino. Nellie Wiley entered into a contract dated February 17, 1910, with the owner of the property, Huntington Land and Improvement Company, a corporation. Thereunder she agreed to purchase the land for the price of $25,326, the purchase price being payable in four instalments as follows: $8,442 on delivery of the agreement; $4,221 on or before August 17, 1910; $4,221 on or before February 17, 1911; and $8,442 on or before February 17, 1912. Nellie Wiley executed a written assignment, dated March 31, 1910, of her interest in the contract and in the land to her daughters, May and Belle. This assignment was written on the contract, the body thereof being in the handwriting of ' Mr. Young. By a writing dated October 30, 1911, May and Belle reassigned to their mother, Nellie Wiley, their interest in the contract and in the land; the reassignment was written on the contract itself and the body thereof was in Mr. Young’s handwriting. By a grant deed dated September 17, 1911, and recorded on November 15, 1911, Huntington Land and Improvement Company conveyed the parcel of land to Nellie Wiley and by a grant deed dated September 29, 1911, and recorded on November 15, 1911, Nellie Wiley conveyed the land to Belle. The record title has been in the name of Belle since that date. On November 15, 1911, a mortgage of the property, dated August 17, 1911, executed by Nellie Wiley in favor of Huntington Land and Improvement Company was also recorded. A satisfaction of that mortgage was thereafter recorded on April 6, 1912. The respective dates of payment of the four instalments of the purchase price were March 17, 1910, August 17, 1910, February 20, 1911, and April 6, 1912. The court found that the first three payments were made by Nellie Wiley and the last payment by Belle and May.
 

 As set forth in the joint pretrial statement, one of the matters as to which the parties were in agreement was as follows : “At all times here in question, a relationship of trust and confidence existed between May Wiley Adams and defendant [Belle Wilej*- Young] and between defendant and Nellie Wiley, her mother. ” During the period of time from Decern
 
 *147
 
 ber 4, 1916, to November 28, 1960, May Wiley Adams made payments on account of real property taxes on the San Marino land, the payments generally being equal to one-half of the taxes for such years.
 
 [1]
 
 She also paid portions of other expenses relating to that land, including sewer assessments, a weed assessment, the charge for a survey, the expense of lot cleaning and the cost of signs.
 

 In her holographic will dated May 3, 1961, executed less than two months before her death, May made no mention of the San Marino property. That will contained no residuary clause. But in an earlier holographic will, executed in 1937. May devised and bequeathed to her son Wiley all of her real and personal property except that she devised “that undivided interest in Lot 2, San Marino Park San Marino to my sister in lieu of debt” and her one-half undivided interest in another parcel of real property to Belle’s daughters.
 

 It was stipulated that, except in isolated instances, all of the property taxes, assessments and other expenses relating to three parcels of real estate, record title to which stood in the names of May and Belle as tenants in common, were paid by the two sisters in equal shares. It was further stipulated that, except in isolated instances, all of the property taxes, assessments and other expenses relating to two parcels of real property, as to which the record title stood in the name of May alone, were paid by May alone. A stipulation similar to that last noted was made as to payments of the same nature with respect to two other parcels of land, the record title to which stood in the name of Belle alone, the stipulation being that the payments were made by Belle alone.
 

 The plaintiff Wiley B. Adams, who was 52 years old at the time of the trial in 1964, testified that he first heard of the San Marino property in 1927 during a conversation with his mother, May Wiley Adams, at their home in Pasadena. He went with her to the property on one occasion in that year after she told him that she was going to look at some property which Belle and she owned for the purpose of seeing whether the weeds had been removed. In 1936 he assisted her in preparing material for her income tax return and
 
 *148
 
 she showed him the cancelled cheeks for one-half of the taxes on the San Marino land. In 1943 she told him that she still owned the property. Several years later she told him that she still owned it and said: “I don’t know what we want to do about it. We have no plans.” In March of 1961 he obtained information for May’s income tax return from Belle; he asked her for the checks relating to the taxes on the San Marino land and Belle handed him checks which had been signed by his mother. May lived with Belle in the years 1944-1961.
 

 Belle Wiley Young was a witness at the trial. She was then approximately 84 years old and exhibited difficulty in recalling past events. She testified that she and May trusted each other and each loaned money to the other • without the use of promissory notes. On properties which they owned together they shared expenses and on properties which they owned separately the one owning the property paid the expenses, except that there were occasions when one would aid the other. As early as 1910 Belle observed that May’s marriage was not a happy one. Belle and her mother disliked May’s husband, Burton Adams, an attitude which went back to the year 1910 or earlier. Belle further testified that she and her mother bought the San Marino property. Belle was not financially able to handle the transaction herself and for that reason she had to obtain the aid of her mother. The mother purchased the property in her own name and made the down payment of approximately $8,000. She believed that her mother also made the second and third payments. Belle testified that she made the final payment by means of her mother’s money, but she “wouldn’t swear to it.” At a later stage of her testimony, however, Belle said that she thought that she personally paid the final instalment. Belle further testified that her mother was repaid out of her half of the rentals received from property on Broadway in Los Angeles which she and May owned.
 

 Belle testified that at the time of May’s death, neither was indebted to the other. She knew that for many years May had been taking an income tax deduction with respect to half of the property taxes on the San Marino property. Belle further knew that a person could not take such a deduction with respect to property he did not own. As to her mother’s attitude toward her two daughters, Belle and May, Belle testified: “We had an equal amount. If we hadn’t an equal amount, my mother would have stepped in and made an awful fuss. ’ ’
 

 
 *149
 
 With respect to a survey of the Sau Marino property which May ordered in 1946, a check signed by May supported the inference that May paid half of the cost. A portion of Belle’s testimony was as follows: “They started building houses outside here of our property, and I suggested we have a survey made because I received, I think, one or two letters asking if they’d sell so many feet of this property to enlarge this property for gardens or a garage or something.” When asked to whom she was referring when she used the word “we” in that answer, Belle testified: “Well, I suppose I talked it over with my sister about it, because to get her advice. I went to her for a lot of advice. The Court : And when you used the words ‘we should have a survey made,’ you were referring to ‘I’? The Witness: Yes.” She further testified that May “inquired around” for a surveyor for her.
 

 Marie C. Sutherland, a witness called on behalf of the plaintiff, testified that she and her sister became “social friends” of the Wiley family. In 1911 or 1912 at the witness’ home, Belle and May said that they were going to build their homes on the San Marino property. In 1960, less than a year before May died, in response to the witness’ question May said that they still had the property. Belle, who was present, made no comment. The witness further testified that in that conversation May said, “The taxes are so high, we’ll have to do something about it. ’ ’
 

 The primary problem presented is whether the evidence to which reference has been made, including the inferences which find reasonable support therein, is sufficient to sustain the determination of the trial court. As stated in
 
 Glassell
 
 v.
 
 Prentiss,
 
 175 Cal.App.2d 599, at page 604 [346 P.2d 895] : “. . . it must be remembered that, in reviewing the sufficiency of evidence to sustain findings of fact an appellate court must accept as true that testimony and the reasonable deductions which may be drawn therefrom which will support the findings, and reject as untrue that which is in conflict therewith. ’ ’
 

 In
 
 Orella
 
 v.
 
 Johnson,
 
 38 Cal.2d 693, at pages 696-697 [242 P.2d 5], the Supreme Court stated: “If a grantor conveys property to another in reliance on the oral promise of the latter to hold the property in trust for the grantor or a third person and the grantee subsequently repudiates the trust, it is settled that a constructive trust may be enforced against the grantee if the conveyance was induced by fraud
 
 *150
 
 or if there was a confidential relationship between the parties. [Citations.] Such trusts are enforced under the provisions of section 2224 of the Civil Code that ‘One who gains a thing by fraud ... is ... an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.’ It is either the actual fraud that induced the conveyance, or the constructive fraud arising from the confidential relationship coupled with the breach of the oral promise, that brings the provisions of the section into play. [Citations.] Since under this section the trust is in favor of the person who, but for the fraud, ‘would otherwise have had’ the property, the effect of its application when the grantee refuses to perform his oral promise, is to enforce the trust in favor of the intended beneficiary. [Citations.] ”
 

 In
 
 Androski
 
 v.
 
 Thurber,
 
 136 Cal.App.2d 471 [288 P.2d 898], a suit was brought to enforce a constructive trust with respect to a tract of land which a father had deeded to the defendant, one of his children. The plaintiffs were the grantor’s other children. They alleged that the defendant orally promised his father to hold the land in trust for all of the children in equal shares and that the father executed the deed because of the trust and confidence he reposed in the defendant. In affirming a decree that the defendant held title to the property in trust for himself and the plaintiffs in equal shares, the court stated (136 Cal.App.2d, at page 478) : ‘ ‘ This is not an action to enforce an oral express trust, or one based upon the claim that the original promise was fraudulently made. As was said in
 
 Steinberger
 
 v.
 
 Steinberger,
 
 60 Cal.App.2d 116 [140 P.2d 31], this is ‘an action to enforce a constructive trust which it is claimed arose by operation of law upon the repudiation of the promise to reconvey,’ or to convey to others a portion of the property. ’ ’
 

 It is true that, unlike the situation in the
 
 Androski
 
 case, in the present case all of the persons who could have testified of their own knowledge with respect to facts bearing directly on the issue as to the existence or nonexistence of an oral agreement to hold in trust for May were deceased except Belle, who, as has been noted, did not have a memory sufficient to enable her to testify helpfully with respect to some important factual matters. But in
 
 Casey
 
 v.
 
 Casey,
 
 97 Cal.App.2d 875 [218 P.2d 842], a case involving the question of the rights of the parties in an apartment building, the court stated (page 882): “For the proof of a transfer in trust no proof of what was said at the transfer is required. As early as
 
 Gunter
 
 v.
 
 James,
 
 9 Cal. 643, 655, it
 
 *151
 
 was held that the existence of an express trust could be proved by the circumstances. In
 
 Hansen
 
 v.
 
 Bear Film Co., Inc., supra,
 
 28 Cal.2d 154, 168-169 [168 P.2d 946), the finding of an express oral promise and agreement to hold in trust was upheld, solely on inferences from the circumstances, behavior and posterior declarations of transferor and transferee without any indication of what was actually spoken between them.” That view is in harmony with the law, generally applicable to trials, that an issue of fact may be proved circumstantially and that indirect evidence may outweigh direct evidence as to a contested matter. (See
 
 Bruce
 
 v.
 
 Ullery,
 
 58 Cal.2d 702, 711 [25 Cal.Rptr. 841, 375 P.2d 833];
 
 Pierce
 
 v.
 
 Standow,
 
 163 Cal.App.2d 286, 288 [329 P.2d 44].) Moreover, as stated in
 
 Ignagni
 
 v.
 
 A. J. Peters & Son, Inc.,
 
 147 Cal.App.2d 661, at page 663 [305 P.2d 953] : “ It is also well settled that in order to support an inference based on circumstantial evidence it is not incumbent upon the plaintiff to exclude the possibility of every other reasonable inference from the proved facts. ’ ” (See also
 
 Sheffield
 
 v.
 
 Runner,
 
 163 Cal.App.2d 48, 52 [328 P.2d 828].)
 

 Furthermore, “while it is true that the courts have frequently stated that clear and convincing evidence is required to justify a court in finding that a deed which purports to convey land absolute in fee simple was intended to be, in fact, one creating a trust, such rule is primarily for the trial court’s guidance and if there is substantial evidence to support its conclusion the determination is not open to review on appeal.”
 
 (Teixeira
 
 v.
 
 Domingos,
 
 171 Cal.App.2d 196, at page 201 [339 P.2d 863].)
 

 As has been noted, the parties to the present suit agreed that at all pertinent times a relationship of trust and confidence existed between Belle and her mother, Nellie Wiley, and between Belle and her sister, May. It was stated in
 
 Estate of Cover,
 
 188 Cal. 133, at page 143 [204 P. 583] : “Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelitv of another.” (See
 
 Atwood
 
 v.
 
 Elwood,
 
 132 Cal.App.2d 761, 768-769 [283 P.2d 43].)
 

 While the evidence upon which the plaintiff relied in the trial court was mainly circumstantial in nature, under the applicable law as hereinabove set forth that did not preclude the granting of the relief sought. Tt is undisputed that Nellie Wiley made the initial payment of $8,442
 
 *152
 
 for the land at the time of the execution of the contract of purchase, dated February 17, 1910, and that shortly thereafter Nellie Wiley executed a written assignment, dated March 31, 1910, of her interest in the contract and in the land to Belle and May. While the assignment contained a recital that it was for “value received” (as did the subsequent reassignment), in view of the relationship between Mrs. Wiley and her two daughters, as disclosed by the evidence, the trial court was warranted in drawing the inference that the recital in the assignment was a mere matter of form and that a gift rather than a sale was involved. (See
 
 Kott
 
 v.
 
 Hilton,
 
 45 Cal.App.2d 548, 552 [114 P.2d 666].) Moreover, the assignment indicated an intention on the part of the mother to benefit both daughters equally. The reassignment by Belle and May to their mother was dated October 30, 1911, and, again, the trial court was warranted in drawing the inference that no consideration was involved. The deed from Nellie Wiley to Belle was recorded on November 15, 1911, approximately two weeks after the date of the reassignment. It was a reasonable inference that in naming Belle as the sole grantee, Mrs. Wiley was motivated by the fact that she was not kindly disposed toward her daughter May’s husband, Burton Adams, and, accordingly, did not wish May’s interest to be a matter of public record.
 

 The trial court was free to attach substantial significance to the evidence that Belle and May shared equally the burden of the payment of taxes, assessments and expenses relating to the San Marino property, thus following their practice as to other properties owned jointly by them rather than their practice as to payments of that nature with respect to properties separately owned. It was a fair inference that such payments were not gifts by May to Belle in return for Belle’s kindness in permitting May to reside with her,
 
 [2]
 
 inasmuch as the testimony heretofore noted as to May’s statements evidenced a continuous belief on her part that she and Belle owned the property and thus supported the inference that she had no intent to make such payments by way of gift. (See
 
 Watenpaugh
 
 v.
 
 State Teachers’ Retirement System,
 
 51 Cal.2d 675, 679-680 [336 P.2d 165];
 
 Horsman
 
 v.
 
 Maden,
 
 48 Cal.App.2d 635, 641 [120 P.2d 92].) Moreover,
 
 *153
 
 Belle knew that May claimed a deduction in her income tax returns for the portion of the San Marino property taxes paid by her and that such a deduction was proper only if May was in fact an owner of an interest in the land. Belle’s acquiescence in the acts of May relating to the San Marino land was consistent with a recognition on Belle’s part that May had an equal share with her in that property.
 

 The appellant asserts that the trial court committed prejudicial error in the admission of evidence. The first instance cited is the receipt in evidence of a financial statement on a printed bank form. The pencilled notations were in the handwriting of an officer of the bank. The statement purported to list May’s assets as of December 6, 1927. In a column headed by the words “Title Standing in Name of” the words “with sister” were inserted with respect to the San Marino property, and following the words “with sister” were the words “cost 25000.” The property was described as “% Int 5 acres San Marino Huntington Dr.” The paper was found in May’s effects after her death. The officer was deceased and testimony was given by another bank official as to the customary manner in which such a rough draft of a financial statement was prepared in the course of an interview with a borrower. The court overruled
 
 the
 
 defendant’s objection to the admission in evidence of the statement, stating that it was admissible under the Uniform Business Records as Evidence Act. After further argument the court added: “. . . there is also included, naturally, the other ground, heretofore discussed with reference to state of mind, et cetera; . . .” At most, the statement embodied May’s declaration that she was an owner of an interest in the San Marino land. While the evidence was not admissible for the truth of the matter contained in the statement, if it be assumed that the foundation as to the making of the declaration by May was sufficient the statement could properly be considered by the court as evidence of a state of mind on May’s part which supported the inference that her acts with respect to the San Marino property were not mere favors to Belle. But, in any event, in view of the other evidence of that state of mind on May’s part, the challenged evidence was cumulative and did not give rise to prejudicial error since it is not reasonably probable that if such evidence had been excluded the...determination of .the case on its merits, would have been different... ....
 

 The second instance of asserted error in the admission
 
 *154
 
 of evidence relates to the holographic will of May, dated August 19, 1937, in which May stated that she devised “that undivided interest in Lot 2, San Marino Park San Marino to my sister in lieu of debt.” In overruling the defendant’s objection, the trial court stated that the will was admissible as evidence of May’s state of mind. The court further stated that it was not received for the purpose of proving title to the property but that, in view of the defenses of laches and the statute of limitations, there was present the question of whether, with respect to any claim of an interest in the land as the beneficiary of a trust, the decedent (May) was conscious of any “repudiation or denial by the person [Belle] in whom the record title” stood. (See
 
 Airola
 
 v.
 
 Gorham,
 
 56 Cal.App.2d 42, 53 [133 P.2d 78].) In the light of the limitation placed on the extent of the consideration to be given to the language of the will, there is no basis for a claim of prejudicial error.
 

 In the remaining instances of asserted error in the admission of evidence, the defendant refers to the following 1 ‘ hearsay declarations”: “Wiley quoted May as allegedly having told him in 1927 that she wanted him to accompany her to the San Marino property which she and her sister owned, in order to inspect the property for weeds; that on other occasions, in answer to his inquiry, she told him that she and her sister still owned the property; that the property was still assessed to the Huntington Land and Improvement Co. because she and her sister did not wish to be bothered by-real estate agents, and finally, that she and her sister still owned the property and had no plans for its disposition. The Court admitted these hearsay statements, on the theory that they fell under the state of mind exception to the hearsay rule. ’ ’
 

 With respect to its ruling on the defendant’s objection as to Wiley’s testimony about his conversation with May when he first heard of the San Marino property in 1927, the trial court stated that it doubted that the evidence was “admissible for anything except possibly a state of mind, and by virtue of the pleas of laches and statute of limitations affirmative defenses, the query of any awareness on the part of the decedent as to any repudiation . . . - of any alleged trust, ...” For the reasons heretofore set forth in this opinion, including the discussion as to the relevancy of evidence of May’s state of mind, the rulings of the court with respect to such remaining instances of alleged errors in the admission of evidence, whether considered separately or
 
 *155
 
 together, cannot be said to constitute error of a prejudicial nature.
 

 It is further contended that the trial court committed prejudicial error by placing the burden of proof on Belle. The contention is stated in part as follows: “The Court expressed its opinion that when a fiduciary relationship exists between two parties, as in the present case, and there is a transfer of property in the joint names of the fiduciaries and subsequently one of the two fiduciaries obtains title in himself, that fiduciary has the burden of proving that he engaged in no wrongful activity in obtaining a fee simple title.” The statement of the court was not applicable to the present case inasmuch as the plaintiff did not proceed on the theory that in 1911 Belle gained an advantage over May by reason of the deed from Nellie Wiley to Belle. (See
 
 Burdick
 
 v.
 
 Wittich,
 
 46 Cal.App.2d 456, 462-463 [116 P.2d 90].) The plaintiff’s action, instead of being of that nature, was one to enforce a constructive trust which, the plaintiff asserted, arose by operation of law after the death of May when Belle repudiated her agreement to hold a one-half undivided interest in the San Marino property in trust for May. (See
 
 Orella
 
 v.
 
 Johnson, supra,
 
 38 Cal.2d 693, 696-697;
 
 Androski
 
 v.
 
 Thurber, supra,
 
 136 Cal.App.2d 471, 478.) As to such a cause of action the burden of proof was on the plaintiff.
 
 (Hansen
 
 v.
 
 Bear Film Co., Inc.,
 
 28 Cal.2d 154, 173 [168 P.2d 946]
 
 ; Dagdigian
 
 v.
 
 Dagdigian,
 
 139 Cal.App.2d 721, 722-723 [294 P.2d 507].)
 

 Under the circumstances of the present ease no statement by the trial court as to the burden of proof or as to the burden of going forward with evidence resulted in a miscarriage of justice. The cause, was submitted on June 1, 1964, and the determination thereof by the trial court was not announced until August 25, 1964. If the trial court had labored under a misconception as to the party upon whom any burden was imposed, in the absence of any showing in the record to the contrary we must presume that prior to resolving the issues under submission the trial court gave further consideration to that matter and resolved the issues of fact in the light of the applicable law. Unlike the situation in cases such as
 
 Ehrenreich
 
 v.
 
 Shelton,
 
 213 Cal.App.2d 376 [28 Cal.Rptr. 855], and
 
 People
 
 v.
 
 Van Gorden,
 
 226 Cal.App.2d 634 [38 Cal.Rptr. 265], there is no basis for a determination that a misconception of the law resulted in a judgment which otherwise probably would not have been ren
 
 *156
 
 dered. As stated in
 
 DeCou
 
 v.
 
 Howell,
 
 190 Cal. 741, at page 751 [214 P. 444] : “The deliberations of the court are conclusively merged in the judgment. The findings of fact and conclusions of law constitute the decision which is the final, deliberate expression of the court. To hold that oral or written opinions or expressions of judges of trial courts may be resorted to to overturn judgments would be to open the door to mischievous and vexatious practices. ’ ’
 

 Turning to the defenses of the statute of limitations and laches, the record shows that May died on June 30. 1961, and that the present action was commenced on February 25, 1963. There was no evidence that prior to May’s death Belle repudiated her duty and obligation to May with respect to May’s interest in the San Marino property. In
 
 Marshall
 
 v.
 
 Marshall,
 
 232 Cal.App.2d 232 [42 Cal.Rptr. 686], the court stated at pages 250-251: “Defendants next contend that the action is barred by the statute of limitations and by laches. Where, as here, an action is brought to impress a constructive trust on real property and to have plaintiff adjudged to be the owner thereof, such an action is in effect one for the recovery of real property within the meaning of Code of Civil Procedure section 318 and the applicable period of limitations is the five-year period prescribed by that section. [Citations.] In such an action to enforce an oral promise to reconvey property on the grounds of constructive fraud, the statute of limitations does not commence to run until the transferee repudiates the oral promise or dies. [Citations.]” And at pages 251-252, the court stated: “As the court said in
 
 Butler
 
 v.
 
 Holman
 
 (1956) 146 Cal.App.2d 22, 28 [303 P.2d 573], cert. denied 353 U.S. 930 [1 L.Ed.2d 723, 77 S.Ct. 718], ‘Laches is an unreasonable delay in asserting a right which causes such prejudice to an adverse party as renders the granting of relief inequitable. ’ The question of laches is one for the determination of the trial court in the light of the facts and circumstances of the particular ease and its conclusion thereon will not be set aside by an appellate court if there is substantial support for it in the evidence. [Citations.] In an action to establish a constructive trust based on the violation of a parol promise continuing in nature, the doctrine of laches does not begin to operate until the trustee begins to act in hostility to such continuing obligation and such repudiation of the trust has been brought home to the beneficiary. [Citations.] ” Under the governing law the trial court properly determined that neither the statute of limita^
 
 *157
 
 tions nor the doctrine of laches precluded the granting of relief to-the plaintiff.
 

 The defendant presents the further contention that there was insufficient evidence to support the finding of the trial court that May did not release or surrender to Belle her interest in the San Marino property. It is argued that “All the evidence as to May’s acts in relation to the property indicate that in fact May’s failure to request a conveyance from Belle during May’s life was intended to and did release Belle from any duty she may have had to transfer a one-half interest to May. ” It is further argued that if the motive for the manner in which the transaction was handled was the protection of May as against her husband, Burton Adams, such protection was no longer necessary after his death in 1940, but May did not thereafter seek to have her interest in the property conveyed to her. Attention is also directed to the failure to mention the property in May’s will executed shortly before her death in 1961. This court, however, cannot on appellate review undertake to reweigh the evidence. While it may be difficult to understand why May failed to mention the San Marino property in her last will inasmuch as she had mentioned it in her 1937 will, it cannot be said that the trial court’s determination that May did not release or surrender her interest in the property to Belle is without substantial support in the record.
 

 The contention remaining for consideration is that the trial court committed reversible error by failing to make a finding on a material issue and that the findings do not support the judgment. It is stated: “Although the judgment runs in favor of the Estate of May Wiley Adams, the Court failed to make an essential finding of fact,
 
 i.e., that the alleged oral trust vested in May’s estate or heirs, when she failed to request a convey anee during her life.”
 
 The core of the contention appears to be that under the findings of fact May had only an interest in the San Marino property during her life and that, since she did not request a conveyance of her interest prior to her death, whatever interest she had terminated. There is no support in the record for a conclusion that May’s interest in the land was so limited. The defendant apparently bases her position upon the finding of the trial court that by the terms of the oral agreement “Belle would convey the record title to said undivided one-half interest ... to May upon her request” and upon the finding that no such request was made by May in her
 
 *158
 
 lifetime. It is to be noted that immediately preceding the quoted finding the court made the following finding as to the oral agreement: “Belle would receive and hold in trust for May an undivided one-half interest in said record legal title and in and to The Property [sic]; the other one-half interest therein to belong to Belle. ’ ’ Findings of fact “must be liberally construed and are to be resolved in favor of upholding rather than defeating the judgment.”
 
 (Estate of Ruben,
 
 224 Cal.App.2d 600, 608 [136 Cal.Rptr. 752].) That basic rule was not altered by the amendment in 1959 of section 634 of the Code of Civil Procedure.
 
 (Mashon
 
 v.
 
 Haddock,
 
 190 Cal.App.2d 151, 167 [11 Cal.Rptr. 865].) The construction which the defendant attempts to place upon the findings of fact as to the agreement pursuant to which the record title was placed in Belle is unreasonable and unwarranted. The reasonable construction is that the court found that the agreement was that Belle and May were to have equal interests in the land and not that May’s interest would terminate if she made no request for a conveyance during her lifetime. The trial court having made its findings of fact, the question of the disposition of May’s interest upon her death was one of law which the trial court properly resolved. The judgment is supported by the findings of fact.
 

 The judgment is affirmed.
 

 Cobey, J., and Moss, J., concurred.
 

 A petition for a rehearing was denied November 8, 1967, and appellant’s petition for a hearing by the Supreme Court was denied December 13, 1967. MeComb, J., was of the opinion that the petition should be granted.
 

 [1]
 

 Sucli payment of taxes for the period of time stated was not in dispute. There was no specific evidence as to payments of that nature for previous tax years. One of the findings of fact of the trial court was:
 
 ‘1
 
 Commencing with on or about September, 1911, and continuing until the death of May, all costs and expenses of ownership of The Property [sic], including the aforefound final payment of principal and interest to Land Company, taxes, assessments, weed clearing, and other expenses of ownership, were paid in equal shares by Belle and May. ’ ’
 

 [2]
 

 One of the findings of the trial court was that “May lived rent and hoard free with Belle for various periods of time during the years 1916 to 1944 and continuously from 1944 until the last illness of May in 1961.” Belle testified, however, that after Mr. Young’s death she and May “shared the expenses at the house.”