Filed 10/27/21  P. v. Lopez CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL GABRIEL LOPEZ,<br><br>    Defendant and Appellant. | F080274<br><br>(Super. Ct. No. F19904670)<br><br><br>**OPINION** |

<u>THE COURT</u>\*

APPEAL from a judgment of the Superior Court of Fresno County.  David Andrew Gottlieb, Judge.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Hill, P. J., Franson, J. and Smith, J.

Defendant Daniel Gabriel Lopez was convicted by jury trial of attempted first degree residential burglary and possession of a smoking device. On appeal, he contends there was insufficient evidence to support his conviction for attempted first degree residential burglary. We find there was sufficient evidence to support his conviction and affirm the judgment of the trial court.

## PROCEDURAL SUMMARY

On September 20, 2019, the Fresno County District Attorney filed a first amended information charging defendant with attempted first degree residential burglary (Pen. Code, §§ 664, 459, and 460, subd. (a);[1] count 1) and possession of a smoking device (Health & Saf. Code, § 11364, subd. (a); count 2). It was further alleged defendant had suffered a prior strike conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), a prior felony conviction (§ 667, subd. (a)(1)), and three prior prison terms (§ 667.5, subd. (b)). The People moved to dismiss one of the prior prison term allegations, which the trial court granted.

On September 24, 2019, a jury found defendant guilty on both counts.

On November 4, 2019, the trial court struck the prior felony conviction and the remaining two prior prison term enhancements. That same day, defendant was sentenced to three years in state prison on count 1, doubled to six years for the prior strike. As to count 2, he was given credit for time served.

On November 7, 2019, defendant filed a notice of appeal.

---

**1**     All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL SUMMARY

**Prosecution's Case**

*Joshua*

On July 12, 2019, at approximately 5:00 p.m.,[2] 14-year-old Joshua was home alone while his mother and sister were at the mall. He was playing video games when he heard a gate close. His dogs began barking and he saw someone walk past his window. He called his mother and sister. His sister answered and he told her "someone was in [their] house." He went to the back of the house and looked out the kitchen door. He saw defendant "messing with the washer machine."[3] As soon as Joshua saw defendant, he went to the restroom and locked himself inside. He remained there for about 10 minutes until police arrived. While he was in the restroom, he heard the doorknob of his mother's bedroom door, which led to the backyard, being "jiggled." Joshua remained on the phone with his mother, who told him the doors to the house were locked.

On cross-examination Joshua clarified that he meant to tell his sister there was someone *on* their property, and not *in* their house. He acknowledged defendant never went inside. He denied hearing any banging, wood breaking, or metal to metal contact. The two back doors were "solid metal" with deadbolts and knobs.

*Sandra*

Joshua's mother, Sandra, testified there were two entrances in the back of the house—one door led to the kitchen and the other led to her bedroom. She clarified that both entrances had an interior door and an exterior metal security screen door. She stated that when she left the house on the day of the incident, the metal screen doors were

---

**2**    Joshua testified the incident occurred at approximately 1:00 p.m., but the testimony from other witnesses placed the incident around approximately 5:00 or 5:30 p.m.

**3**    The laundry machine was interchangeably referred to as a washing machine and a dryer throughout the record.

locked, as was the front door. She said she kept a bucket with tools on a stand outside the kitchen back door. The bucket contained "screwdrivers, flatheads and hammers."

Sandra testified that as soon as she received Joshua's call, she "dropped everything and [] took off and [] called the police." When she arrived at her house, she saw that police officers had detained defendant. After she checked on Joshua, she went to the backyard. She noticed her tools had been moved to the ground and a "long screwdriver" and a hammer were lying near her door. She also noticed the dryer door was open and her bedroom door looked like it had been "jimmied with or messed with." She said the door "looked kind of open," and the doorknob "looked kind of weird." She stated, "[I]t was just kind of like off, like something wasn't covered the whole way."

Sandra acknowledged that when she and her daughter got home and went to the backyard, her daughter picked up some of the tools before she had the opportunity to look around. She said, "[W]hen me and my daughter went to the back, my daughter started picking up things."

### Officer Wells

Fresno Police Officer Rebekah Wells testified she was one of the officers that responded to Sandra's residence. When she arrived, officers were instructing defendant to walk toward the front of the house. She eventually made contact with defendant, who she said was "very" cooperative with her. Defendant was wearing a fanny pack. When she searched it, she found jewelry and a glass pipe with a bulb. She observed a burn mark on the bottom of the bulb. She testified that in her experience, the pipe was commonly used to smoke methamphetamine. She believed defendant was under the influence because he had dilated pupils and rapid speech. However, he knew where he was, was cooperative, followed directions, and was responsive to her questions.

When Wells inspected the doorknob on Sandra's door, she said, "I noticed that when I lifted it up, as soon as I moved my hand away, the knob dropped creating some type of gap between the door frame itself and the doorknob."

4.

**Defense's Case**

Defendant testified in his own defense. He stated that prior to going onto Sandra's property, he was in the shade in front of some nearby apartments and was getting ready to leave. He took four "hits" of methamphetamine, but "the last two hits didn't go too well." He felt dizzy and felt something was wrong; however, he said the "hits" did not affect his ability to think clearly. He felt sick and needed to lie down. He didn't want to be "in the streets," because it was late afternoon and he knew night was approaching. He then began walking around and encountered Sandra's house. He thought the house was unoccupied because "the whole front looked dead." He opened the gate and went to the backyard to lie down. He laid down near some stairs by the back doors. He then thought he heard voices, so he got up quickly and opened the dryer door and looked inside of it. Once he saw it was empty, he returned to the stairs and sat down. He said he did not touch the doorknobs, try to open the doors, touch any tools, take anything, or intend to enter the house. He said he was only thinking about feeling better. When the police officers arrived and instructed him to walk to the front of the house, he complied with their requests.

On cross-examination defendant testified he was familiar with the area and he knew there were two restaurants nearby and a playground. He said he usually did not go to the playground during the day because there were children around. He also admitted he was convicted of felony domestic violence in 2014 and auto theft in 2016.

**Rebuttal**

On rebuttal, Wells testified she was familiar with the area of Sandra's residence because it was part of her patrol assignment. She was also familiar with the nearby playground and knew it had multiple structures, including a restroom, and trees. She further testified that after defendant was transported to the Fresno Police Department headquarters, she conducted a formal interview of defendant. She asked him why he had

5.

gone to Sandra's residence. Defendant shrugged his shoulders and said he did not know why. He said, "[J]ust because."

## DISCUSSION

Defendant contends there was insufficient evidence to find him guilty of attempted first degree residential burglary because there was only "weak circumstantial evidence of an attempt to enter, and no evidence at all of an intent to steal."

## I. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009), 46 Cal.4th 913, 919.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.) The standard of review is the same in cases in which a conviction is based primarily on circumstantial evidence. (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) On appeal, the court " 'neither reweigh[s] the evidence nor reevaluate[s] the credibility of witnesses.' " (*Ibid.*)

## II. Attempted First Degree Residential Burglary

"Attempted burglary requires two elements: (1) the specific intent to commit burglary and (2) a direct but ineffectual act toward its commission." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.) "Every person who enters any house … with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) "Every burglary of an inhabited dwelling house … is burglary of the first degree." (§ 460, subd. (a).) Whether the defendant had the requisite intent is " ' "rarely susceptible of

direct proof and must usually be inferred from all of the facts and circumstances disclosed by the evidence." ' " (*People v. Holt* (1997) 15 Cal.4th 619, 669–670.)

### III. Analysis

Here, defendant contends he thought the house was abandoned and was merely looking for shade because he did not feel well. He asserts he did not intend to steal, did not have any "burglary tools," and did not attempt to flee. Defendant argues such evidence does not support a reasonable inference that he intended to commit a burglary when he went onto Sandra's property.

Defendant's argument seeks an improper reweighing of the evidence and ignores the record, which supports the jury's verdict. The evidence established defendant went onto Sandra's property while Joshua was inside of the home. Joshua heard a gate open and then saw defendant pass by his window. Joshua's dogs were barking. When Joshua looked in the backyard, he saw defendant opening the washer and later heard him "jiggle[]" the doorknob of his mother's door. When Sandra arrived, she noticed her tools had been moved, and a screwdriver and hammer were by her door. Her doorknob appeared to have been tampered with and her door "looked kind of open." Wells also testified the doorknob looked as though it had been tampered with.

Additionally, although it appeared defendant was under the influence of methamphetamine when the incident took place, Wells testified defendant knew where he was, was cooperative, followed directions, and was responsive to her questions. When she asked him why he had been on Sandra's property, he shrugged his shoulders and said that he did not know why. He said, "[J]ust because." There was no mention that he did not feel well and was looking for shade. Moreover, there was evidence that there was a nearby playground with restrooms and trees. There were also two restaurants nearby. Based on this evidence, it was reasonable for the jury to deduce that defendant attempted to enter Sandra's residence with the intent to burglarize, and not to simply look for shade since there were areas nearby where he could have gone to seek shelter.

7.

Although defendant testified he had not taken anything or intended to enter the house, the jury was entitled to reject his testimony. It is " 'the duty of the jury to determine to what extent they believe or disbelieve the testimony.' " (*Hansen v. Bear Film Co.* (1946) 28 Cal.2d 154, 184.) An appellate court only considers " 'whether the record contains substantial evidence tending to support the findings assailed.' " (*Ibid.*) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We conclude that, when viewed in the light most favorable to the jury's verdict, there was sufficient evidence for the jury to find defendant had the requisite intent to enter Sandra's home and commit a burglary.

## DISPOSITION

The judgment is affirmed.